## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

TERRANCE BURTON,
*Plaintiff*,

v.

MARYANN SALERNO, et al.,
*Defendants*.

No. 3:20-cv-1926 (VAB)

## INITIAL REVIEW ORDER AND
## RULING ON MOTION FOR PRELIMINARY INJUNCTION

Terrance Burton ("Plaintiff") is currently incarcerated at Carl Robinson Correctional Institution in Enfield, Connecticut. He has filed a civil rights Complaint *pro se* under 42 U.S.C. § 1983 against Commissary Supervisor Maryann Salerno ("Supervisor Salerno"), Commissary Supervisor Stack ("Supervisor Stack"), Commissary Manager Lou Renzi ("Manager Rienzi"), Commissary Officer Leal ("Officer Leal"), Director of Correctional Enterprises of Connecticut James Gaglione ("CEC Director Gaglione"),[1] Warden Kenneth Butricks, Deputy Warden Jesus Guadarrama, Correctional Lieutenant Saas, Correctional External Affairs/Intelligence Officer McMahon ("Officer McMahon"), Correctional Counselor Stacy Martinez, Administrative Remedies Coordinator ("ARC") Green, ARC Cooper, and Correctional Officer Moranda.

Mr. Burton's allegations arise from his employment as an inmate worker in the commissary warehouse at Cheshire Correctional Institution ("Cheshire") from December 10,

---

[1] Correctional Enterprises of Connecticut ("CEC") is a Unit within the Administration Division of the State of Connecticut Department of Correction. *See Correction Enterprises of Connecticut*, Conn. Dept. of Corr., https://portal.ct.gov/DOC/Enterprise/Enterprise (last visited July 27, 2027).  It is evident from the description of CEC on the Department of Correction website that Mr. Burton has misspelled CEC Director James Gaglione's last name as Gaylione. *Id.* Accordingly, the Court directs the Clerk to edit the docket to reflect the correct spelling of Defendant Gaglione's last name as Gaglione.

2018 until May 28, 2020. Mr. Burton also has filed a motion seeking injunctive relief.

For the reasons set forth below, the Court will **DISMISS** the Complaint in part and **DENY** the motion for injunctive relief.

### I.   BACKGROUND

On December 10, 2018, Department of Correction officials allegedly permitted Mr. Burton to work in the commissary warehouse at Cheshire Correctional Institution as a "bagger." Compl., ECF No. 1 at 4 ¶¶ 1-2 (Dec. 29, 2020). As of March 7, 2019, Supervisor Salerno allegedly had promoted Mr. Burton to "running the head of the line." *Id.* at 4 ¶ 3.

On March 11, 2020, Commissary Manager Renzi, Commissary Supervisors Stack and Salerno and Officer Leal allegedly held a meeting with the inmate workers in response to an incident involving the Supervisor Stack's refusal to permit two inmates to leave their jobs in the warehouse to get a drink of water. *Id.* at 4-5 ¶¶ 4-6. During the meeting, Mr. Burton allegedly informed Supervisor Stack and Manager Rienzi that Supervisor Salerno had accused him of stealing on a number of occasions and routinely expressed her dislike of inmates and that she and other staff members exhaled smoke into the warehouse as they stood outside smoking cigarettes. *Id.* at 5 ¶¶ 7-9.

Mr. Burton allegedly stated that he had asked Supervisor Salerno to stop blowing smoke into the warehouse because he suffered from "lung issues." *Id.* at 5 ¶ 9. Mr. Burton also allegedly informed Manger Rienzi that Officer Leal often walked around the warehouse threatening to issue disciplinary reports to him and to place him in the restrictive housing unit for simply doing his job. *Id.* at 5 ¶ 10. Manager Renzi allegedly remarked that he was unaware of these issues and would speak to his staff members about them. *Id.* at 6 ¶ 12.

When Warden Butricks allegedly became aware of the issues that Mr. Burton had raised

2

in the meeting, he and other prison officials allegedly visited the commissary warehouse. *Id.* at 6 ¶ 13. Mr. Burton, however, allegedly was not present in the warehouse for this visit. *Id.* ¶ 14. After meeting with inmate workers in the warehouse, Warden Butricks allegedly visited Mr. Burton in his housing unit and informed him that if he did not "put up with the issues in the warehouse and ask to leave the [job] program," he would not be considered for any other prison job or job program as long as he remained at Cheshire. *Id.* ¶ 15.

On several occasions after the warning by Warden Butricks, Mr. Burton allegedly informed Manager Renzi about Supervisor Salerno's conduct. *Id.* ¶ 16. On March 15, 2020, Mr. Burton allegedly sent a letter to CEC Director Gaglione and requested that he address the issues raised at the March 11, 2020 meeting pertaining to misconduct by warehouse staff members. *Id.* at 6-7 ¶¶ 17-18. CEC Director Gaglione allegedly did not respond to Mr. Burton's letter. *Id.* at 7 ¶ 19.

On March 18, 2020, Mr. Burton allegedly asked Supervisor Stack to move him from the head of the line position to a bagging position because he was upset that Supervisor Salerno continued to accuse him of stealing. *Id.* ¶ 21. Supervisor Stack allegedly informed Mr. Burton that he could not authorize a move to another position within the commissary warehouse and suggested that Mr. Burton speak to Supervisor Salerno. *Id.* ¶ 22.

Later that day, Mr. Burton allegedly asked Supervisor Salerno to move him to a bagging position because he did not enjoy being accused of stealing envelopes. *Id.* ¶¶ 23-24. Supervisor Salerno allegedly indicated that the envelope count was good and that she was not going to assign him to another position in the warehouse. *Id.* at 8 ¶ 25. Later in the shift, another inmate allegedly informed Mr. Burton and Supervisor Salerno that he had misplaced 100 or so envelopes. *Id.* ¶¶ 26-27. Supervisor Salerno allegedly began to yell and curse at the other inmate.

3

*Id.* ¶ 27. When Mr. Burton allegedly remarked that this type of incident was the reason that he was wanted to switch to bagging, Supervisor Salerno allegedly swore at Burton and stated that he would do what she ordered him to do. *Id.* ¶¶ 28-29.

On March 19, 2020, Supervisor Salerno allegedly stood near Mr. Burton in the warehouse and looked at him in an intimidating manner. *Id.* ¶ 31. Mr. Burton allegedly overheard Supervisor Salerno tell a commissary officer that she wanted him "gone from the program." *Id.* The officer allegedly then spoke to Mr. Burton and suggested that Supervisor Salerno was going to fire him if he did not perform his job at a faster pace. *Id.* at 9 ¶ 32. Later that day, Mr. Burton allegedly overheard Supervisor Salerno instruct Officer Leal to remove him from the work list for the following day and remarked that she would remove him from the program. *Id.* ¶¶ 33-34.

On March 23, 2020, Mr. Burton allegedly informed Manager Renzi that he wanted to be moved to a bagging position and that the other supervisors in the warehouse would not facilitate his transfer. *Id.* ¶¶ 35-36. Manager Renzi allegedly indicated that he would take care of it and called Supervisor Stack into his office. *Id.* ¶ 36. Supervisor Stack allegedly informed Supervisor Salerno about his meeting with Manager Renzi. *Id.* ¶ 37. Mr. Burton allegedly overheard Salerno shout that she would fire him if he was transferred to the bagging area. *Id.* ¶ 38.

Supervisor Stack allegedly ordered Mr. Burton to verify the commissary orders and to bag the orders without any assistance. *Id.* 10 ¶ 40. At times, other inmates allegedly would come over to assist Mr. Burton but Supervisor Salerno would send the inmates off to perform another job. *Id.* ¶ 41. Mr. Burton allegedly worked as a verifier and a bagger without assistance for weeks. *Id.* ¶ 42

At some point in May 2020, Commissary Leal allegedly informed the warehouse workers

4

that they would not be permitted to return to their housing units at any time before 1:30 p.m. to make legal telephone calls and that all legal calls would have to made after 1:30 p.m. with the assistance of Correctional Counselor Martinez. *Id.* ¶ 43. All commissary workers allegedly were required to lock up by 2:45 p.m. and Counselor Martinez's workday ended at 3:00 p.m. *Id.* ¶ 47. Mr. Burton allegedly informed Officer Leal that he did not need Counselor Martinez's assistance to make a legal telephone call and suggested that some legal calls might have to be scheduled during the morning. *Id.* at 11 ¶ 44. Officer Leal allegedly indicated that the fact that Mr. Burton might not require Counselor Martinez's assistance to make a legal call was unimportant. *Id.*

Mr. Burton allegedly believed that the new telephone use policy had been implemented by Counselor Martinez, Officer Leal, and Supervisors Stack and Salerno. *Id.* ¶ 46. When Mr. Burton allegedly attempted to make a legal call before 1:30 p.m., Counselor Martinez allegedly stopped him from completing the call. *Id.* ¶ 48.

On May 14, 2020, Mr. Burton allegedly asked Supervisor Stack to permit him to stay in the housing unit to make a legal call using the housing unit phone, *Id.* ¶ 50. Supervisor Stack allegedly indicated that he could not make an exception for Mr. Burton. *Id.* ¶ 51. When Mr. Burton allegedly returned to his housing unit, Counselor Martinez allegedly informed Burton that he would have to wait to make his legal call until she permitted him to do so. *Id.* at 12 ¶ 53.

On May 15, 2020, Mr. Burton allegedly handed Supervisor Stack an inmate request form on which he had written that he had a right to make a legal call under the State of Connecticut Department of Correction Administrative Directives and that he needed to make a legal call from the housing unit phone the following morning. *Id.* ¶¶ 54-55. Mr. Burton allegedly informed Supervisor Stack that the courts were only permitting calls at set times and that he needed to speak to a particular court clerk. *Id.* ¶¶ 57-58. Supervisor Stack allegedly tried to reach a

compromise with Mr. Burton regarding the legal call, but Burton allegedly had no interest in discussing the matter. *Id.* at 12-13 ¶¶ 59-61. Supervisor Stack allegedly did not respond to Mr. Burton's inmate request or grant him permission to make a legal call the following morning. *Id.* at 13 ¶¶ 63-64.

On May 20, 2020, another inmate allegedly assisted Mr. Burton in the bagging area. Supervisor Salerno allegedly instructed Officer Leal to direct the other inmate to return to his post. *Id.* ¶ 65. On May 27, 2020, Supervisors Stack and Salerno allegedly instructed Mr. Burton to work by himself even though they permitted other inmates to assist one another in the performance of their jobs. *Id.* at 14 ¶ 67. On May 28, 2020, as Mr. Burton allegedly waited for someone to bring him a basket, Supervisor Salerno allegedly intentionally brought over too many baskets to be filled and labeled by Mr. Burton causing one of the baskets to fall to the floor. *Id.* ¶¶ 68-71. Supervisor Salerno allegedly swore at Mr. Burton. *Id.* ¶ 72. Mr. Burton allegedly watched Supervisor Salerno walk over to Officer Leal and overheard her tell Leal to take "Burton in he's not working." *Id.* ¶ 74.

Officer Leal allegedly approached Mr. Burton and stated that he was taking Mr. Burton in for failing to perform his job. *Id.* at 15 ¶¶ 75-76. Mr. Burton allegedly attempted to speak to Manager Renzi, but Supervisor Stack allegedly pushed Mr. Burton out of Renzi's office. *Id.* ¶ 77. Mr. Burton allegedly explained to Supervisor Stack that Salerno deliberately pushed his work to the floor and spoke to him in a disrespectful manner. *Id.* ¶ 78. Supervisor Stack allegedly instructed Mr. Burton to leave the warehouse for the day. *Id.* ¶ 79. Mr. Burton allegedly complied with the order and returned to his housing unit. *Id.* An officer in Mr. Burtons' housing unit allegedly directed Mr. Burton to pack his things because he needed to move from the unit due to having been fired from his job. *Id.* ¶ 80.

Later that day, Mr. Burton allegedly spoke to Warden Butricks about the circumstances surrounding the decision to fire him from his job. *Id.* at 16 ¶ 85. Warden Butricks allegedly directed Mr. Burton to write up the incident and walked away. *Id.* ¶ 88. Later that day, Mr. Burton allegedly sent an inmate request to Warden Butricks and filed a Level 1 grievance claiming that Commissary Supervisors Stack and Salerno had not followed the Department of Correction Administrative Directives when they removed him from his position in the warehouse. *Id.* at 16-17 ¶¶ 84, 92; Exs. D and G to Compl., ECF No. 1-1 (Dec. 29, 2020). Mr. Burton also allegedly drafted and sent a five-page letter to CEC Director Gaglione regarding the circumstances under which he had been fired from his job in the commissary. *Id.* at 17 ¶¶ 90-91.

On May 29, 2020, Officer Leal allegedly informed Mr. Burton that Supervisor Salerno had been "targeting" him for over seven months and that Supervisor Salerno had ordered Mr. Burton to be fired. *Id.* at 18 ¶¶ 96-100. On June 1, 2020, Mr. Burton allegedly sent a written request to Deputy Warden Petterson claiming that in firing him from his job, Supervisor Salerno allegedly had failed to comply with Department of Correction Administrative Directives and asked that he be reinstated to his position. *Id.* at 17 ¶ 89; Ex. E to Compl., ECF No. 1-1 (Dec. 29, 2020). From May 28, 2020 until August 6, 2020, Mr. Burton allegedly filed letters, inmate requests, Level 1 grievances, Level 2 grievance appeals, and video preservation requests regarding various issues that stemmed from his having being fired from his job in the commissary warehouse. *Id.* at 17-26 ¶¶ 89-158; Exs. A – X; A-1-A-22, ECF No. 1-1 (Dec. 29, 2020).

On August 11, 2020, while Mr. Burton and other inmates in South Block 6 allegedly were at dinner, Officer McMahon allegedly conducted routine inspections of the cells in South Block 6. *Id.* ¶ 159. Officer McMahon's inspection of Mr. Burton's cell allegedly included a

search of the items in the cell.  Officer McMahon allegedly did not search any other cells in the

housing unit. *Id.* On August 13, 2020, during another routine cell inspection, Mr. Burton

allegedly observed McMahon going through some documents related to this lawsuit. *Id.* ¶¶ 161-

63. When Mr. Burton allegedly accused Officer McMahon of retaliating against him, she

allegedly dropped the documents and left the cell. *Id.* ¶ 164. On September 14, 2020, prison

officials at Cheshire allegedly transferred Mr. Burton to Osborn Correctional Institution

("Osborn"). *Id.* ¶ 189.

## II.    STANDARD OF REVIEW

Under 28 U.S.C. § 1915A(b), district courts must review prisoners' civil complaints

against governmental actors and *sua sponte* "dismiss . . . any portion of [a] complaint [that] is

frivolous, malicious, or fails to state a claim upon which relief may be granted," or that "seeks

monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b); *see*

*also Liner v. Goord*, 196 F.3d 132, 134 & n.1 (2d Cir. 1999) (explaining that, under the Prisoner

Litigation Reform Act, *sua sponte* dismissal of frivolous prisoner complaints is mandatory);

*Tapia-Ortiz v. Winter*, 185 F.3d 8, 11 (2d Cir. 1999) ("Section 1915A requires that a district

court screen a civil complaint brought by a prisoner against a governmental entity or its agents

and dismiss the complaint *sua sponte* if, *inter alia,* the complaint is 'frivolous, malicious, or fails

to state a claim upon which relief may be granted.'") (quoting 28 U.S.C. § 1915A). This standard

of review "appl[ies] to all civil complaints brought by prisoners against governmental officials or

entities regardless of whether the prisoner has paid [a] filing fee." *Shakur v. Selsky*, 391 F.3d

106, 112 (2d Cir. 2004) (internal quotation marks and citation omitted).

Rule 8 of the Federal Rules of Civil Procedure requires that a plaintiff plead only "a short

and plain statement of the claim showing that the pleader is entitled to relief," *see* Fed. R. Civ. P.

8(a)(2), to provide the defendant "fair notice of what the . . . claim is and the grounds upon which it rests," *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level" and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 555, 570. A claim is facially plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Although the Federal Rules of Civil Procedure do not require "detailed factual allegations," a complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement." *Twombly*, 550 U.S. at 555–57. Plausibility at the pleading stage is nonetheless distinct from probability, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claim] is improbable, and . . . recovery is very remote and unlikely." *Id*. at 556 (internal quotation marks omitted).

Complaints filed by *pro se* plaintiffs, however, "must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F. 3d 471, 474 (2d Cir. 2006)) (internal quotation marks omitted); *see also Tracy v. Freshwater*, 623 F. 3d 90, 101–02 (2d Cir. 2010) (discussing the "special solicitude" courts afford pro se litigants).

## III.   DISCUSSION

Mr. Burton contends that the Defendants violated his rights under the First, Eighth and Fourteenth Amendments of the United States Constitution. He also asserts a state law claim of

9

intentional infliction of emotional distress.   He sues the Defendants in their individual and official capacities and seeks monetary, declaratory, and injunctive relief.

### A.     Federal Tort Claims Act Claim

In the second paragraph of the complaint, Mr. Burton contends that his "Federal tort claims are authorized by 28 U.S.C. § 1346." ECF No. 1 at 1. The Federal Tort Claims Act ("FTCA") provides the exclusive remedy for persons injured by the negligent or wrongful actions of federal employees, including common law torts, acting in the scope of their employment. *See* 28 U.S.C. §§ 1346(b)(1), 2679(a)-(b)(1); 28 U.S.C. 2680(h). Because the defendants named in the complaint are not federal employees, the provisions of the FTCA are not applicable to Mr. Burton's allegations. *See Brownback v. King*, 141 S. Ct. 740, 745 (2021) ("The FTCA streamlined litigation for parties injured by federal employees acting within the scope of their employment."); *Davis v. United States*, 430 F. Supp. 2d 67, 72 (D. Conn. 2006) ("The FTCA permits the United States to be sued for torts committed by United States employees acting within the scope of their employment.") (citing 28 U.S.C. § 2674)).

Accordingly, the claims asserted under the FTCA will be dismissed. *See* 28 U.S.C. § 1915A(b)(1).

### B.     Section 1983 – First Amendment Retaliation Claim

The Second Circuit has "instructed district courts to 'approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.'" *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (quoting *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir. 2003)). Retaliation

claims "stated in wholly conclusory terms" are insufficient. *Id.* (internal quotation marks and citations omitted). To plead a First Amendment retaliation claim, an inmate must plausibly allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dolan*, 794 F.3d at 294 (internal quotation marks and citation omitted). "An adverse action is defined as 'retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.'" *Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019) (quoting *Davis*, 320 F.3d at 353).

An inmate's informal or formal written complaint, grievance, or request  constitutes "a protected activity" under the First Amendment. *Brandon*, 938 F.3d at 40 (citation omitted). However, "the Second Circuit has yet to articulate a bright line rule regarding constitutionally protected oral speech by an inmate." *Booker v. Griffin*, No. 16-CV-00072 (NSR), 2018 WL 1614346, at *17 (S.D.N.Y. Mar. 31, 2018) (citations omitted).

District courts within this Circuit have concluded that "[i]n some circumstances this protection extends beyond the filing of formal grievances to oral complaints made to corrections officers." *Tirado v. Shutt*, No. 13CV2848-LTS-AJP, 2015 WL 4476027, at *4 (S.D.N.Y. July 22, 2015); *see also Gomez v. Dep't of Corr.*, No. 3:20-CV-00958 (JAM), 2020 WL 6526108, at *3 (D. Conn. Nov. 4, 2020) ("A prisoner has a right under the First Amendment to complain about prison conditions, especially conditions that the prisoner believes endanger his health and safety."); *McMillian v. Cty. of Onondaga*, No. 9:13-CV-1124 TJM/ATB, 2015 WL 1403459, at *10–11 (N.D.N.Y. Mar. 26, 2015) ("There is support for the proposition that an inmate's verbal complaints might serve as the basis for a section 1983 retaliation claim."), *report and recommendation adopted*, 2016 WL 9781807 (N.D.N.Y. Mar. 29, 2016), *aff'd*, 710 F. App'x 458

11

(2d Cir. 2017).

Mr. Burton includes allegations that Officer Leal, Commissary Supervisors Stack and Salerno and Warden Butricks retaliated against him by firing him from his job in the commissary because he had exercised his right to free speech and to seek redress of grievances by asserting verbal complaints regarding conditions in the commissary warehouse as well as complaints about the past conduct of Supervisor Salerno. Mr. Burton also alleges that Officer McMahon searched his cell in retaliation for his filing of grievances against her and against Supervisor Salerno.

### 1.    The Claim Against Leal, Stack, Salerno, and Butricks

For purposes of this ruling, the Court will assume that Mr. Burton's verbal complaints about the conduct of Defendants Leal, Salerno and Stack constitute protected speech.

Mr. Burton alleges that Defendants Leal, Salerno, and Stack were involved in the decision to terminate him from his commissary warehouse job and suggests that Defendant Butricks was aware of or condoned the decision. These allegations are sufficient to state a claim of adverse action. *See, e.g.*, *Gill v. Mooney*, 824 F.2d 192, 194 (2d Cir. 1987) (acknowledging that a First Amendment retaliation claim would be plausible if an "otherwise routine administrative decision[]" such as a change in an inmate's work assignment as "made in retaliation for the exercise of constitutionally protected rights"); *Henderson v. Vanderwerff*, No. 9:13-cv-1537 (MAD/CFH), 2016 WL 660921, at *4–5 (N.D.N.Y. Feb. 18, 2016) (plaintiff stated plausible "First Amendment retaliation claim against Defendant Chuttey in relation to the termination from his job at the prison library").

Given the relatively short time period, two and one-half months, between the meeting during which Mr. Burton asserted his complaints about conditions in the commissary warehouse and the conduct of  Leal, Salerno and Stack and the decision to dismiss him from the commissary

job, the Court concludes that Mr. Burton has met the causal connection requirement of a retaliation claim.

Accordingly, this First Amendment claim will proceed against Officer Leal and Supervisors Stack and Salerno and Warden Butricks in their individual capacities and in their official capacities, as discussed below, to the extent that Mr. Burton seeks injunctive relief related to this claim.

### 2. The Claim Against Renzi, Guadarrama, and Gaglione

Mr. Burton alleges that on March 15, 2020, he sent a letter to CEC Director Gaglione and requested that he address the issues raised at the March 11, 2020 meeting pertaining to misconduct by warehouse staff members. Mr. Burton states that after he was dismissed from his commissary job on May 28, 2020, he filed inmate requests addressed to Deputy Warden Pettersen and Commissary Manager Renzi and sent a letter to CEC Director Gaglione in which he stated that he believed that his dismissal was retaliatory. Comp. ¶¶ 89-91, 103. He suggested to Gaglione that Salerno may have retaliated against him based on the letter that he had sent to Gaglione on March 15, 2020. *Id.* ¶ 90. Deputy Warden Guadarrama responded to the request addressed to Deputy Warden Petterson. *Id.* ¶ 89.

A plaintiff seeking to recover money damages under section 1983 from a defendant in his or her individual capacity must demonstrate "the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). A government or prison official is not personally involved in a constitutional violation simply because he or she was the supervisor of other defendants who may have violated the plaintiff's constitutional rights. *See Raspardo v. Carlone*, 770 F.3d 97, 116 (2d Cir. 2014) ("[L]iability for supervisory government officials cannot be premised on a theory of *respondeat*

*superior* because § 1983 requires individual, personalized liability on the part of each government defendant").

The Second Circuit has recently held that "after *Iqbal,* there is no special rule for supervisory liability," and instead, "[t]he violation must be established against the supervisory official directly." *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020). Therefore, in order to demonstrate personal involvement under section 1983, "a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Id.* (quoting *Iqbal*, 556 U.S. at 676). Once a plaintiff properly alleges that a defendant was personally involved in a constitutional deprivation, he or she "must also establish that the supervisor's actions were the proximate cause of the plaintiff's constitutional deprivation." *Raspardo*, 770 F.3d at 116.

Mr. Burton does not assert facts to suggest that Deputy Warden Guadarrama, or Commissary Manager Renzi, or CEC Director Gaglione were directly involved in the alleged retaliatory decision to fire him from his position in the commissary warehouse. Thus, to the extent that he intended to assert a First Amendment retaliation claim against these three Defendants in their individual capacities, the claim will be dismissed. *See* 28 U.S.C. § 1915A(b)(1). As discussed below, the retaliation claim will proceed against Defendants Renzi, Gaglione and Guadarrama in their official capacities to the extent that Mr. Burton seeks injunctive relief related to this claim.

### 3.    The Claims Against McMahon

Mr. Burton alleges that on May 28, 2020, June 9, 2020, June 16, 2020, and July 9, 2020, he submitted requests to Officer McMahon, who is also a Freedom of Information Act Liaison, to preserve video footage of the commissary warehouse. Compl. ¶¶ 94, 121, 141; Exs. I, X, A-4,

A-9 to Compl., ECF No. 1-1 (Dec. 29, 2020). On August 5, 2020, he allegedly placed a grievance in the administrative remedies box claiming that McMahon had failed to process his requests to preserve video footage of various incidents in the commissary warehouse. *Id.* ¶ 160. On August 12, 2020, he allegedly received a receipt indicating that his grievance against Officer McMahon had been received by an administrative remedies coordinator. *Id.* He allegedly contends that on August 11, 2020 and on August 13, 2020, Officer McMahon allegedly searched his cell during allegedly routine inspections and that on August 13, 2020, Officer McMahon also allegedly looked through documents pertaining to this lawsuit. *Id.* ¶¶ 159, 161-64.

It is not clear from these facts that on the dates that Officer McMahon allegedly inspected and searched Mr. Burton's cell and read his legal documents, she was even aware of the grievance filed against her or the grievances filed against Supervisor Salerno. Furthermore, courts in the Second Circuit have held that a search of an inmate's cell in and of itself does not constitute adverse conduct. *See Harnage v. Brighthaupt*, No. 3:12CV1521(AWT), 2016 WL 10100763, at *6 (D. Conn. June 3, 2016) (collecting cases), *aff'd*, 720 F. App'x 79 (2d Cir. 2018). Mr. Burton does not allege that Officer McMahon confiscated or destroyed any documents during her routine inspections of his cell on two occasions in August 2020.

Thus, Mr. Burton has failed to allege facts to plausibly meet the second or the third prong of the retaliation standard.

Accordingly, the First Amendment claim that Officer McMahon allegedly searched Mr. Burton's cell on August 11, 2020 and on August 13, 2020 and viewed his legal documents during the second search in retaliation for a grievance that Mr. Burton had deposited in the grievance box on August 5, 2020, but was not received by the grievance coordinator until August 12, 2020, will be dismissed. *See* 28 U.S.C. § 1915A(b)(1).

**C.     Section 1983 - First Amendment Access to Courts Claim**

It is well settled that inmates have a First Amendment "right of access to the courts."

*Bounds v. Smith*, 430 U.S. 817, 828 (1977), *modified on other grounds, Lewis v. Casey*, 518 U.S.

343, 350 (1996). The "right of access to the courts," requires States "to give prisoners a

reasonably adequate opportunity to present claimed violations of fundamental constitutional

rights to the courts." *Id.* at 825. Thus, prison officials must "assist inmates in the preparation and

filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate

assistance from persons trained in the law." *Id.* at 828.

To state a claim for denial of access to the courts, an inmate is required to demonstrate

that he suffered an actual injury as a result of the conduct of the defendants. *Lewis*, 518 U.S. at

351-53. To establish an actual injury, an inmate must allege facts showing that the defendant

took or was responsible for actions that hindered his efforts to pursue a "nonfrivolous" legal

claim. *Christopher v. Harbury*, 536 U.S. 403, 414–15 (2002) ("Whether access claim turns on a

litigating opportunity yet to be gained or an opportunity already lost  . . . plaintiff  must identify a

'nonfrivolous,' 'arguable' underlying claim" that he sought to pursue or seeks to pursue in court)

(quoting *Lewis*, 518 U.S. at 353 & n.3)).

Mr. Burton alleges that in May 2020, Counselor Martinez, Officer Leal and Commissary

Supervisors Stack and Salerno implemented a rule that precluded inmates who worked in the

commissary warehouse from making legal telephone calls prior to 1:30 p.m. on weekdays. He

contends that this limitation on legal telephone calls violated his right of access to the courts.

Mr. Burton alleges that he engaged in a discussion with Supervisor Stack regarding his

concerns about the rule limiting legal telephone calls to afternoon hours, but they could not reach

a compromise. Mr. Burton asserts that he needed to speak to an attorney who worked in a

16

courthouse in Connecticut and that court was limiting legal calls to specific time slots. He does not indicate the nature of the legal matter that he needed to speak to an attorney about. Nor does he allege that he was unable to re-schedule the telephone call with the attorney to a weekday afternoon or that any delay in reaching the attorney deprived him of the opportunity to raise a non-frivolous claim or otherwise prejudiced a civil or criminal matter. Thus, Mr. Burton has not met the injury requirement. *See Lewis*, 518 U.S. at 351 ("[T]he inmate therefore must go one step further and demonstrate that the alleged shortcomings in [his access to the court] hindered his efforts to pursue a legal claim. He might show, for example, that a complaint he prepared was dismissed for failure to satisfy some technical requirement which, because of deficiencies in the prison's legal assistance facilities, he could not have known. Or that he had suffered arguably actionable harm that he wished to bring before the courts, but was so stymied by inadequacies . . . that he was unable even to file a complaint.").

Accordingly, the claim that the Defendants Leal, Stack, Salerno, and Martinez violated Mr. Burton's First Amendment right of access to the courts by restricting his use of the telephone in his housing unit to make legal calls in May 2020 will be dismissed. *See* 28 U.S.C. § 1915A(b)(1).

### D.    Section 1983 - Fourteenth Amendment Due Process Claim

#### 1.    Procedural Due Process – Prison Employment

It is well-established that inmates have no constitutionally protected property or liberty interest in an assignment to a prison job. *See Gill*, 824 F.2d at 194  (holding there is no constitutional right to a job absent state law mandating the provision of prison jobs or limiting the discretion of individuals empowered to assign prison jobs); *Lewis v. Sieminski*, No. 3:08-CV-728 JCH, 2010 WL 3827991, at *6 (D. Conn. Sept. 22, 2010) ("An inmate, however, has no

17

constitutional right to a job in prison.") (citations omitted); *Banks v. Norton*, 346 F. Supp. 917, 921 (D. Conn. 1972) (noting that an inmate has no right to a particular job in a correctional institution); State of Connecticut Department of Correction Administrative Directive 10.1(4)A ("No inmate shall have entitlement or a legitimate expectation to any work, programmatic or educational assignment or compensation therefor," with certain exceptions not here relevant) (effective as of October 22, 2015). Moreover, lack of employment while incarcerated does not present an "atypical and significant hardship on the inmate," but is, rather, an "ordinary incident of prison life." *Sandin v. Connor*, 515 U.S. 472, 484 (1995); *see also Bussey v. Phillips*, 419 F. Supp. 2d 569, 580 (S.D.N.Y. 2006) (removal from prison job "well within the terms of confinement ordinarily contemplated by [a] prison sentence").

Mr. Burton's allegations may be construed to assert a claim that Defendants Leal, Stack, Renzi and Salerno and failed to provide him with procedural due process prior to or in connection with their decision to dismiss him from his job in the commissary warehouse. Because Mr. Burton has no liberty or property interest in his prison job, however, the fact that he lost his prison job in the commissary at Cheshire did not violate his Fourteenth Amendment due process rights.

Accordingly, any due process claim related to the plaintiff's loss of his commissary job will be dismissed as lacking an arguable legal basis. *See* 28 U.S.C. § 1915A(b)(1).

### 2.    Grievance Procedures

Inmates have no constitutional entitlement to grievance procedures, to receive a response to a grievance, or to have a grievance processed properly. *See Riddick v. Semple*, 731 F. App'x 11, 13 (2d Cir. 2018) (summary order) (claim relating to grievance procedures "confused a state-created procedural entitlement with a constitutional right"; "neither state policies nor 'state

18

statutes ... create federally protected due process entitlements to specific state-mandated procedures' ") (quoting *Holcomb v. Lykens*, 337 F.3d 217, 224 (2d Cir. 2003)); *Brown v. Graham*, 470 F. App'x 11, 13 (2d Cir. 2012) (summary order) ("Brown's argument that he has a federally-protected liberty interest in the state's compliance with its own prison grievance procedures is meritless.") (citing *Holcomb*, 337 F.3d at 224); *Kalican v. Dzurenda*, No. 3:12-CV-1009 SRU, 2015 WL 1806561, at *6 (D. Conn. Apr. 21, 2015) ("no constitutional entitlement to receive responses to his grievances").

Mr. Burton contends that Defendants Green and Cooper violated his right to due process by failing to properly process his many grievances and grievance appeals. Mr. Burton alleges that ARCs Cooper and Green refused to properly process his grievances and grievance appeals pertaining to his request to make a legal telephone call in mid-May 2020 and the loss of his commissary job at the end of May 2020. Compl. ¶¶ 104-20, 123-25, 133, 137-39, 148-58. He contends that the failure of both Cooper and Green to comply with the requirements of Department of Correction Administrative Directive 9.6 in processing his grievances and grievances appeals constitutes a violation of his right to due process under the Fourteenth Amendment.

But Mr. Burton's allegations that Defendants Green and Cooper failed or refused to properly process his Level 1 grievances and Level 2 and Level 3 grievances appeals in violation of the Department of Correction's administrative grievance procedures governing claims involving conditions of confinement do not state a claim under the Due Process Clause of the Fourteenth Amendment. *See Garcia v. Semple*, No. 3:18-CV-1226 (SRU), 2019 WL 5597771, at *15 (D. Conn. Oct. 30, 2019) ("allegations that a prison official violated the procedures set forth in a state's administrative remedy program that is applicable to prisoner grievances do not state a

claim of a violation of an inmate's constitutional rights") (collecting cases).

Accordingly, this Fourteenth Amendment due process claim asserted against ARCs Cooper and Green is dismissed. *See* 28 U.S.C. § 1915A(b)(1).

### E.    Section 1983 - Fourteenth Amendment Equal Protection Claim

The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. It does not mandate identical treatment for each individual or group of individuals. Instead, it requires that similarly situated persons be treated the same. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439-40 (1985).

To state a plausible equal protection claim, a plaintiff must allege facts showing that: (1) he was treated differently from similarly situated individuals and (2) that the difference in or discriminatory treatment was based on "'impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000) (quoting *LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980)).

Mr. Burton alleges that Supervisor Salerno's decision to terminate him from his position in the commissary warehouse constituted discrimination in violation of the Fourteenth Amendment. But Mr. Burton has not alleged that the defendants treated him differently or discriminated against him because of his membership in a protected class or based on some suspect classification.

Absent allegations to support "class-based" discrimination, a plaintiff may state a violation of the Equal Protection Clause under the "class of one" theory. To state a valid class-of-one claim, a plaintiff must allege that he "has been intentionally treated differently from others similarly situated

20

and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). In the Second Circuit, a plausible class of one claim requires a class-of-one plaintiff to "show an extremely high degree of similarity between themselves and the persons to whom they compare themselves." *Clubside v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006) (citation omitted).

Mr. Burton alleges that during the months before Supervisor Salerno dismissed him from his job, she targeted or singled him out for harassment and was intent on finding a way to dismiss him. He alleges further that Salerno did not have a legitimate basis for his dismissing him from his job on May 28, 2020. The Court liberally construes the allegations to state a claim that Supervisor Salerno treated him differently than other similarly situated inmates who were employed in the commissary warehouse and that her decision to terminate him from his job was arbitrary. The Court will permit this class of one equal protection claim to proceed against Defendant Salerno in her individual capacity for further development of the record.

Accordingly, although limited, this claim will not be dismissed in its entirety.

### F.      Section 1983 - Eighth Amendment Conditions Claims

In the context of a prisoner's conditions of confinement, conditions that are "restrictive or even harsh" do not violate the Eighth Amendment because "they are part of the penalty that criminal offenders pay for their offenses against society." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Although the Constitution does not require "comfortable" prison conditions, it does not permit prison officials to maintain conditions which inflict "unnecessary and wanton pain" or which result in the "serious deprivation of basic human needs ... or the minimal civilized measure of life's necessities." *Id.*

To state a claim of deliberate indifference to health or safety due to unconstitutional

conditions of confinement, an inmate must demonstrate both an objective and a subjective

element. To meet the objective element, the inmate must allege that he was incarcerated under a

condition or a combination of conditions that resulted in a "sufficiently serious" deprivation of a

life necessity or a "human need[]" or posed "a substantial risk of serious harm" to his health or

safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Rhodes*, 452 U.S. at 347.

To meet the subjective element, an inmate must allege that the defendants possessed

culpable intent; that is, the officials knew that he or she faced a "substantial risk" to his or her

health or safety and "disregard[ed] that risk by failing to take reasonable measures to abate it."

*Farmer*, 511 U.S. at 847. Thus, an allegation of "mere negligen[t]" conduct is insufficient. *Id.* at

835.

### 1. Verbal Harassment Claim

The Second Circuit has held that verbal harassment by a prison official does not

constitute a violation of the Eighth Amendment. *See, e.g.*, *Purcell v. Coughlin*, 790 F.2d 263,

265 (2d Cir. 1986) (upholding district court's determination that name-calling without

appreciable injury not constitutional injury); *Cane v. New Britain Police Dep't*, No. 3:16-CV-

1638 (SRU), 2017 WL 752278, at *3 (D. Conn. Feb. 27, 2017) ("Verbal harassment or profanity

alone, 'unaccompanied by any injury no matter how inappropriate, unprofessional, or

reprehensible it might seem,' does not constitute the violation of any federally protected right

and therefore is not actionable under section 1983.") (quoting *Aziz Zarif Shabazz v. Pico*, 994 F.

Supp. 460, 474 (S.D.N.Y. 1998)).

Mr. Burton alleges that Officer Leal verbally harassed him by threatening him with

disciplinary action for failing to perform his job and that Supervisor Salerno verbally harassed

him by yelling and swearing at him because she did not like him. Mr. Burton asserts that

Supervisor Stack and Officer Leal were aware of Salerno's unethical or improper behavior but did not report it to their supervisors and that he made Commissary Manager Renzi aware of the improper behavior of Salerno and Leal but Renzi failed to reprimand Salerno or Leal or report their behavior to his supervisor. Nevertheless, there are no factual allegations to suggest that any verbal harassment or failure to report the harassment deprived Mr. Burton of a basic human need or life necessity.

Accordingly, the allegations of verbal harassment by Defendants Salerno and Leal and the failure of Defendants Stack, Leal and Renzi to either report this harassment or reprimand Salerno and Leal for the harassment do not state a plausible violation of Mr. Burton's Eighth Amendment rights and will be dismissed. *See* 28 U.S.C. § 1915A(b)(1).

### 2.    Second-Hand Smoke Claim

In *Helling v. McKinney*, 509 U.S. 25 (1993), the Supreme Court considered an Eighth Amendment claim of a prisoner who was assigned to a cell with another inmate who smoked five packs of cigarettes a day. The Court concluded that the inmate plaintiff may have a cognizable claim if he proved in part that prison officials "exposed him to levels of [second-hand smoke] that pose an unreasonable risk of serious damage to his future health." *Id.* at 35.

Mr. Burton alleges that during his work shifts in the warehouse, Supervisor Salerno and other Department of Correction employees would stand outside the warehouse and blow cigarette smoke into the warehouse. Compl. ¶¶ 8-9. He states that the second-hand smoke posed a risk of serious harm to his health because he suffers from "lung issues." *Id.*

Mr. Burton alleges that he worked in the commissary warehouse each weekday from December 10, 2018 to May 28, 2020 when he was fired from his job and that Supervisor Salerno and other employees smoked every day that he worked. The Court liberally construes these

23

allegations to suggest that Mr. Burton was exposed to second-hand cigarette smoke for a prolonged period. *See Baker v. Moore*, No. 3:16-CV-02005 (JAM), 2016 WL 7493956, at * (D. Conn. Dec. 30, 2016) (Noting that Second Circuit "has sustained Eighth Amendment claims that objectively involve a prolonged and substantial exposure to second-hand smoke.") (collecting cases).

Mr. Burton states that prior to March 11, 2020, he requested that Supervisor Salerno and the other Department of Correction employees who smoked outside the warehouse to refrain from blowing cigarette smoke into the warehouse because he suffered from a medical condition that affected his lungs. Compl. ¶¶ 8-9. During the March 11, 2020 meeting involving inmate commissary workers and Commissary Supervisors Salerno and Stack, Commissary Manager Renzi, and Officer Leal, Mr. Burton brought up the second-hand smoke issue and later that day, Warden Butricks became aware of the issue. *Id.* ¶¶ 5, 8-9, 13. Mr. Burton made CEC Director Gaglione aware of the issue in a letter dated March 15, 2020. *Id.* ¶¶ 17-19. Mr. Burton claims that none of these defendants took steps to remedy the issue.

Mr. Burton has asserted sufficient facts to meet the subjective component of the Eighth Amendment deliberate indifference standard. Although Mr. Burton does not describe the severity of his lung issues or assert that the smoke exacerbated or worsened his condition, the Court will permit the Eighth Amendment claim to proceed against Defendants Salerno, Stack, Leal, Rienzi, Butricks and Gaglione in their individual capacities for further development of the record. *See, e.g.*, *Smith v. Carpenter*, 316 F.3d 178, 188 (2d Cir. 2003)("Smith correctly argues that an Eighth Amendment claim may be based on a defendant's conduct in exposing an inmate to an unreasonable risk of future harm and that actual physical injury is not necessary in order to demonstrate an Eighth Amendment violation.") (citing, *inter alia*, *Helling,* 509 U.S. at 35).

24

### G.    Section 1983 - Preservation of Video Footage Claim

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege facts showing that the

defendant, a person acting under color of state, law deprived him of a federally or

constitutionally protected right. *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 930 (1982).

An inmate's allegation that a prison officer failed to comply with a Department of Correction

administrative directive or regulation does not state a claim of a violation of the inmate's

federally or constitutionally protected rights. *See, e.g.*, *Henderson v. Lozada*, No. 3:21-CV-10

(SRU), 2021 WL 1539196, at *4 (D. Conn. Apr. 19, 2021)("The failure to comply with

an administrative directive, however, does not on its own give rise to a claim under section

1983.") (citing  *Harris v. Taylor*, 441 F. App'x 774, 775 (2d Cir. 2011) (summary order)

and *Osuch v. St. John,* CASE NO. 3:18cv846(JCH), 2018 WL 5778243, at *4 (D. Conn. Nov. 2,

2018) ("Because a failure to follow a Department of Correction directive does not give rise to

a section 1983 claim, any claim based on St. John's alleged violation of Administrative

Directives 8.1 and 8.5 is dismissed.")).

Mr. Burton alleges that he submitted multiple requests to Officer McMahon to preserve

video footage of incidents that occurred in the commissary warehouse, his housing unit, and the

day room of his housing unit in March and May 2020. Mr. Burton claims that Officer McMahon

did not grant all of his requests to preserve video footage in violation of Department of

Correction Administrative Directive 6.9.

The exhibits attached to the complaint reflect that Mr. Burton sent two requests to

preserve video footage to Officer McMahon. *See* Exs. I, X to Compl., ECF No. 1-1, at 21, 47

(Dec. 29, 2020). On June 3, 2020, Mr. Burton received a response indicating that the footage in

the first request had been preserved and that an officer other than Officer McMahon responded to

25

the second request on June 15, 2020. *Id.* On June 16, 2020, Officer McMahon responded to a June 12, 2020 request to preserve video footage that had been forwarded to her by an administrative captain on June 16, 2020 and indicated that the request did not meet the requirements of Administrative Directive 6.9. *See* Ex. A-4, ECF No. 1-1 at 54.

Mr. Burton asserts no facts to suggest that Officer McMahon's responses to his preservation requests violated a right protected by a federal statute or the United States Constitution. *See Aviles v. Rodriguez*, No. 3:19-CV-1140 (SRU), 2019 WL 5695955, at *6 (D. Conn. Nov. 4, 2019) (dismissing claim that the prison official did not preserve video footage of incidents that gave rise to claims of deliberate indifference to health and safety "for failure to state a claim upon which relief may be granted" because plaintiff had not alleged how official's failure "to respond to his requests to preserve the video footage of the incidents violated his federally or constitutionally protected rights").

Accordingly, the allegations related to McMahon's failure to comply with the requirements of Administrative Directive 6.9 in processing his video preservation requests do not state a plausible claim under section 1983 and will be dismissed under 28 U.S.C. § 1915A(b)(1).

## H.    Section 1983 – Claims for Official Capacity Monetary and Declaratory Relief

To the extent that Mr. Burton seeks monetary relief from the Defendants in their official capacities, those requests are barred by the Eleventh Amendment. *See Kentucky v. Graham*, 473 U.S. 159 (1985) (Eleventh Amendment, which protects the state from suits for monetary relief, also protects state officials sued for damages in their official capacity); *Quern v. Jordan*, 440 U.S. 332, 342 (1979) (Section 1983 does not override a state's Eleventh Amendment immunity).

Accordingly, the requests seeking compensatory and punitive damages for violations of Mr. Burton's First, Eighth, and Fourteenth Amendment rights by the Defendants in their official

26

capacities will be dismissed under 28 U.S.C. § 1915A(b)(2).

Mr. Burton seeks a declaration that the Defendants violated his federal constitutional rights. Under the doctrine of *Ex parte Young,* 209 U.S. 123 (1908), a plaintiff may seek prospective injunctive and declaratory relief to address an ongoing or continuing violation of federal law or a threat of a violation of federal law in the future. *See In re Deposit Ins. Agency,* 482 F.3d 612, 618 (2d Cir. 2007); *Ward v. Thomas*, 207 F.3d 114, 120 (2d Cir. 2000). In determining whether *Ex Parte Young* applies, "a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.,* 535 U.S. 635, 645 (2002) (internal quotation marks and citation omitted).

The request for declaratory relief is addressed to conditions that occurred at Cheshire in 2020. A declaration that the Defendants violated his First, Eighth and Fourteenth Amendment rights in the past is barred by the Eleventh Amendment. *See Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993) (the Eleventh Amendment "does not permit judgments against state officers declaring that they violated federal law in the past"); *Green v. Mansour*, 474 U.S. 64, 68 (1985) ("We have refused to extend the reasoning of *Young*... to claims for retrospective relief") (citations omitted).

Accordingly, the request for declaratory relief will be dismissed. *See* 28 U.S.C. § 1915A(b)(1).

I.    **Section 1983 – Official Capacity Injunctive Relief**
      **Motion for Preliminary Injunctive Relief – ECF No 4**

An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010) (citation

omitted). To prevail on a motion seeking preliminary injunctive relief, a party must demonstrate "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Glossip v. Gross*, 135 S. Ct. 2726, 2736 (2015) (internal quotation marks and citation omitted). The irreparable injury prerequisite requires proof of harm that is "actual and imminent" and "not remote or speculative." *Pisarri v. Town Sports Int'l, LLC*, 758 F. App'x 188, 190 (2d Cir. 2019) (summary order) (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979) (internal quotation marks omitted).

A party who seeks a mandatory injunction, *i.e.*, an injunction seeking to order the defendants to perform positive acts, however, must meet a higher standard. *See Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 406 (2d Cir. 2011) (citing *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 n.4 (2d Cir. 2010)). A mandatory preliminary injunction "should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from the denial of preliminary relief." *Id.*

The Complaint seeks several different types of permanent injunctive relief including: (1) an order directing the Defendants to provide him with back pay at a rate of 90 cents an hour; (2) an order directing the Defendants to reinstate him to a job with CEC at Osborn at a rate of 90 cents an hour or to transfer him to the Department of Correction's Second Chance Program at Willard-Cybulski Correctional Institution; (3) an order directing the defendants to place him in a single cell during his confinement at any facility except Willard-Cybulski, until he discharges from his sentence of imprisonment; (4) an order directing the Defendants to place no smoking signs at the entrances and throughout the commissary warehouse at Cheshire; and (5) an order

28

directing the Defendants to remind correctional officers once a year that they must report in writing any incident involving the mistreatment of inmates by other correctional officers. Compl. at 37.

In his motion seeking a preliminary injunction, Mr. Burton also asks the Court to order the Defendants to preserve video footage of incidents that occurred at Cheshire on multiple dates in March and in May 2018 before and just after to his termination from his prison and on two dates in August 2018. ECF No 4 at 1.

As an initial matter, Mr. Burton is no longer confined at Cheshire where he lost his prison job and was subjected to harassment by Supervisor Salerno and to second-hand smoke in the commissary warehouse. Nor is he confined at Osborn, the facility to which prison officials at Cheshire transferred him in September 2020. The Second Circuit has held that an inmate's requests for prospective injunctive relief from correctional officers or officials in connection with conditions of confinement at a particular correctional institution become moot when the inmate is discharged from that institution, is transferred to a different institution, has been released from prison or has received the relief requested. *See Booker v. Graham*, 974 F.3d 101, 107–08 (2d Cir. 2020) ("In this circuit, an inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility.") (internal quotation marks and dictation omitted); *Martin-Trigona v. Shiff*, 702 F.2d 380, 386 (2d Cir. 1983) ("The hallmark of a moot case or controversy is that the relief sought can no longer be given or is no longer needed").

Accordingly, the requests for injunctive relief related to the placement of no smoking signs in the Cheshire commissary warehouse and to Mr. Burton's reinstatement to a job with CEC at Osborn will be dismissed as moot. *See* 28 U.S.C. § 1915A(b)(1).

29

Because Mr. Burton must demonstrate actual success on the merits of the First, Eighth and Fourteenth Amendment claims that proceed against Defendants Gaglione, Rienzi, Leal, Stack, Salerno, Butricks and Guadarrama to obtain injunctive relief, the relief requested in the Complaint and the motion for preliminary injunction must relate to those claims. *See, e.g., Purugganan v. AFC Franchising, LLC*, No. 3:20-CV-00360 (KAD), 2021 WL 268884, at *1–3 (D. Conn. Jan. 27, 2021) ("Success on the merits necessarily refers to the merits of the underlying claims. Accordingly, the Court cannot enjoin AFC based upon alleged conduct that falls outside the scope of the dispute framed by the operative complaint."). The Court concludes that neither the requests for relief in the Complaint seeking a transfer to Willard-Cybulski to participate in the second chance program, to be placed in a single cell until the end of his sentence, and to require correctional officers to submit written reports documenting staff mistreatment of other inmates, nor the request for relief included in the motion for preliminary injunction seeking an order pertaining to the preservation of video footage of incidents that preceded and followed Mr. Burton's termination from his commissary job at Cheshire are related to the First Amendment retaliation claim, the Eighth Amendment conditions of confinement claim, or the Fourteenth Amendment equal protection claim that proceed in this action.

As a result, it would not be appropriate to grant Mr. Burton these requests for relief. *See, e.g., De Beers Consol. Mines Ltd. v. United States*, 325 U.S. 212, 220 (1945) (preliminary injunction appropriate to grant intermediate relief of "the same character as that which may be granted finally," but inappropriate where the injunction "deals with a matter lying wholly outside of the issues in the suit"); *Stewart v. INS*, 762 F.2d 193, 198 (2d Cir. 1985) (holding district court lacked jurisdiction over motion for injunctive relief relating to conduct not alleged in plaintiff's complaint); *Torres v. UConn Health*, No. 3:17-cv-00325 (SRU), 2017 WL 3713521, at *2 (D.

Conn. Aug. 29, 2017) (preliminary injunctive relief not warranted because claim in motion was

unrelated to underlying claims in complaint); *Lebron v. Armstrong*, 289 F. Supp. 2d 56, 61 (D.

Conn. 2003) (denying inmate's request for injunctive relief because, *inter alia*, it was based on

allegations that were different and unrelated to the facts pled in the underlying complaint).

Accordingly, the requests for injunctive relief pertaining to a transfer to Willard-

Cybulski, placement in a single cell and the preparation and submission of reports documenting

staff mistreatment of inmates, that are included in the Complaint, will be dismissed. *See* 28

U.S.C. § 1915A(b)(1). The motion for preliminary injunction seeking an order directing the

Defendants to preserve certain videotape footage also will be denied.[2]

To the extent that the Mr. Burton seeks reinstatement to a job at the same rate of pay that

he received as a commissary worker at Cheshire, 90 cents per hour, and back pay at the same

rater, as injunctive relief for the decision to terminate him from his commissary job for

retaliatory reasons, the Court will permit those requests to proceed against Officer Leal,

Commissary Supervisors Stack and Salerno, Warden Butricks CEC Director Gaglione,

Commissary Manager Rienzi and Deputy Warden Guadarrama in their official capacities, in

conjunction with the underlying claims related to them, even though, at this stage of the case, the

Court is not suggesting that such relief is appropriate

### J.    State Law – Intentional Infliction of Emotional Distress Claim

To state a claim for intentional infliction of emotional distress, a plaintiff must establish

four elements: "(1) that the actor intended to inflict emotional distress or that he knew or should

---

[2] The Court notes that the Clerk of Court will issue the Standing Order Re: Initial Discovery Disclosures, in conjunction with initial review of the Complaint.  The Standing Order includes a requirement that the Defendants preserve any video recordings or photographs that may have captured events giving rise to the complaint. Failure to preserve relevant video footage or photographs may result in the imposition of sanctions.

have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Appleton v. Bd. of Educ. of Town of Stonington,* 254 Conn. 205, 210, 757 A.2d 1059, 1062 (2000) (internal quotation marks and citation omitted). To be held liable for intentional infliction of emotional distress, one's conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 210–11 (internal quotation marks and citation omitted).

Mr. Burton does not identify the Defendants against whom he asserts his claim of intentional infliction of emotional distress. In his description of this claim, he refers to multiple paragraphs of the Complaint. Compl. ¶¶ 215-16. In those paragraphs, Mr. Burton alleges that: Supervisor Salerno blew cigarette smoke into the commissary warehouse on days that he performed his commissary job, yelled and swore at him on two occasions, threatened to fire him on one occasion, interfered with his job performance, and unjustly fired him on May 28, 2020; Officer Leal refused to report Salerno's improper conduct; CEC Director Gaglione refused to further investigate Mr. Burton's allegations; and Officer McMahon allegedly searched his cell on two occasions and looked through documents found in his cell on one occasion. *Id.* ¶ 215.

The Court does not find that the conduct of Supervisor Salerno in verbally harassing Mr. Burton on two occasions, interfering with his job performance, firing him from his job in the commissary warehouse, and blowing cigarette smoke into the commissary warehouse; or the conduct of Leal in refusing to report Salerno's misconduct that led to Mr. Burton's termination from his job; or the conduct of Gaglione in refusing to further investigate Mr. Burton's allegations that he was unjustly fired; or Officer McMahon's behavior in searching Mr. Burton's

cell twice and looking through some of his legal documents, to be "extreme and outrageous" as those terms are interpreted at common law.

The standard in Connecticut to demonstrate extreme and outrageous conduct is "stringent." *Huff v. W. Haven Bd. of Educ.*, 10 F. Supp. 2d 117, 122 (D. Conn. 1998). "[E]xtreme and outrageous" conduct is defined as that which "exceed[s] all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind." *DeLaurentis v. New Haven*, 220 Conn. 225, 267, 597 A.2d 807, 828 (1991).

Accordingly, the Court concludes that Mr. Burton has not stated plausible claims that the alleged conduct of Defendants Salerno, Gaglione. Leal or McMahon, verbally harassing him, blowing cigarette smoke into the commissary warehouse, firing him from his prison job, and searching his cell and looking at his legal documents, constituted the intentional infliction of emotional distress, and these claims of intentional infliction of emotional distress will be dismissed. *See* 28 U.S.C. § 1915A(b)(1).

### K.   Remaining Federal and State Law Claims

Federal Rule of Civil Procedure 20 permits joinder of multiple defendants in one action only if "any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions and occurrences, and any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20(a)(2). The Court approaches the determination of "[w]hat [might] constitute the same transaction or occurrence ... on a case by case basis." *Kehr ex rel. Kehr v. Yamaha Motor Corp., U.S.A.*, 596 F. Supp. 2d 821, 826 (S.D.N.Y. 2008) (citation omitted).

Rule 21 of the Federal Rules of Civil Procedure provides that a court "may sever any

claim against a party" pursuant to a motion filed by a party to the action or on its own. Fed. R.

Civ. P. 21. In exercising its discretion to decide whether to sever a claim, a court should weigh

the following factors: "(1) [do] the claims arise out of the same transaction or occurrence; (2)

[do] the claims present some common question of law or fact; (3) [would] settlement of the

claims or judicial economy be facilitated; (4) will prejudice [] be avoided; and (5) [will] different

witnesses and documentary proof [be] required for the separate claims." *Costello v. Home Depot*

*U.S.A., Inc.*, 888 F. Supp. 2d 258, 263–66 (D. Conn. 2012) (citation omitted).

Mr. Burton includes allegations that, on August 18, 2020, Lieutenant Saas and

Correctional Officer Moranda, who were intelligence officers at Cheshire, questioned him about

an "SD card" and a letter in an envelope. Compl. ¶¶ 171-84. Mr. Burton reviewed the envelope,

the letter in the envelope, and the SD card and informed Lieutenant Saas that the address on the

envelope appeared to an old address of a family members, he did not know anything about the

SD card, and he believed that another inmate was setting him up. *Id.* ¶¶ 174-76, 182-85. Later

that day, after officers searched Mr. Burton's cell, Lieutenant Saas charged Mr. Burton with

possession of contraband and placed him in a cell in the restrictive housing unit. *Id.* ¶ 183, 186.

At some point, Mr. Burton learned that during the search of his cell, officers had confiscated a

copy of the complaint and exhibits that he subsequently filed in this lawsuit. *Id.* ¶ 191. During

Mr. Burton's confinement in the restrictive housing unit, Officer McMahon announced to other

inmates and staff members in the unit that he was working for intelligence. *Id.* ¶ 187.

Upon his transfer to Osborn on September 14, 2020, prison officials placed him in a

dormitory unit. *Id.* ¶¶ 189, 192. Mr. Burton subsequently contracted COVID-19. *Id.* ¶ 192.

Mr. Burton contends that Defendants Moranda, Saas and McMahon violated his First,

Eighth and Fourteenth Amendment rights and engaged in conduct that constituted the intentional

34

infliction of emotional distress under state law. *Id.* ¶¶ 203-16.

These allegations and claims are not sufficiently related to the claims that arise from Mr. Burton's termination from his prison job in May 2020 and his exposure to second-hand smoke at Cheshire from December 2018 to May 2020.

The factual issues and the legal theories related to the claims that: Lieutenant Saas and Officer Moranda issued Mr. Burton a disciplinary report for contraband and placed him in the restrictive housing unit; unidentified officers confiscated a copy the civil rights complaint and exhibits that Mr. Burton subsequently filed in this case; Officer McMahon made statements to inmates and officers in the restrictive housing unit suggesting that Mr. Burton was working with the intelligence division at Cheshire; unspecified prison officials transferred Mr. Burton from Cheshire to Osborn in September 2020; and Mr. Burton was exposed to and subsequently contracted COVID-19 at Osborn, are not common to the factual and legal theories pertaining to Mr. Burton's termination from his job for retaliatory reasons and his exposure to a potentially dangerous condition of confinement during the period at Cheshire when he worked in the commissary warehouse.

As a result, different witnesses/testimony and documentary evidence would be required to prove the separate First, Eighth, and Fourteenth Amendment and intentional infliction of emotional distress claims at trial. The unrelated allegations arising from Mr. Burton's possession or ownership of contraband items, his placement in the restrictive housing unit after receiving a disciplinary report, the confiscation of legal documents, accusations that he worked with the intelligence division at Cheshire, and his transfer to and confinement at Osborn, where he contracted COVID-19, are not properly joined in this action and the relevant factors favor severance of these claims.

Under Rules 20 and 21, Fed. R. Civ. P., the Court will sever and dismiss without prejudice the First, Eighth, and Fourteenth Amendment claims pertaining to the issuance of a disciplinary report for contraband, Mr. Burton's placement in the restrictive housing unit, the confiscation of legal documents, statements made about his association with the intelligence division at Cheshire, his transfer to Osborn, and his exposure to COVID-19 at Osborn, that are asserted against Lieutenant Saas and Officers Moranda and McMahon as well as the state law claim of the intentional infliction of emotional distress associated with these federal claims. If Mr. Burton seeks to pursue these claims and allegations, he must do so by filing a separate lawsuit.

## ORDERS

The Court enters the following orders:

**(1)**     The Clerk of Court is directed to edit the docket to reflect the correct spelling of Defendant CEC Director James Gaglione's last name as Gaglione. The Motion for Preliminary Injunctive Relief is **DENIED**.

The request for declaratory relief for violations of Mr. Burton's federal constitutional rights; all requests for injunctive relief for violations of Mr. Burton's federal constitutional claims except for the requests seeking reinstatement to a job at 90 cents per hour and back pay at the same rate; the First Amendment access to courts claim asserted against Officer Leal and Commissary Supervisors Stack and Salerno and Counselor Martinez; the First Amendment retaliation claim related to the processing of video preservation requests asserted against Officer McMahon; the First Amendment retaliation claim related to the termination of Mr. Burton from his commissary job asserted against CEC Director Gaglione, Commissary Manager Rienzi and Deputy Warden Guadarrama in their individual capacities; the Eighth Amendment claim of

36

verbal harassment asserted against Commissary Manager Rienzi, Commissary Supervisors Salerno and Stack and Officer Leal; the Fourteenth Amendment due process claim related to the decision to terminate Mr. Burton from his job asserted against CEC Director Gaglione, Commissary Manager Rienzi, Deputy Warden Guadarrama, Officer Leal and Commissary Supervisors Stack and Salerno and Warden Butricks; the Fourteenth Amendment due process claim related to the processing of grievances and grievance appeals by ARCs Cooper and Green; and the state law claim of intentional infliction of emotional distress associated with the loss of Mr. Burton's commissary job and his exposure to second hand smoke during the period that he worked in the warehouse are **DISMISSED** under 28 U.S.C. § 1915A(b)(1). The requests for punitive and compensatory damages for violations of Mr. Burtons' federal constitutional rights in their official capacities are **DISMISSED** under to 28 U.S.C. § 1915A(b)(2).

The First, Eighth, and Fourteenth Amendment claims pertaining to the issuance of a disciplinary report for contraband, Mr. Burton's placement in the restrictive housing unit, the confiscation of legal documents, statements made about his association with the intelligence division at Cheshire, his transfer to Osborn, and his exposure to COVID-19 at Osborn that are asserted against Lieutenant Saas and Officers Moranda and McMahon as well as the state law claim of the intentional infliction of emotional distress associated with these federal claims are **SEVERED** and **DISMISSED** without prejudice under Federal Rules of Civil Procedure 20 and 21. If Mr. Burton seeks to pursue these claims, he must do so by filing a separate lawsuit. Thus, all claims asserted against Lieutenant Saas, Officers McMahon and Moranda, ARC Cooper, and ARC Green have been **DISMISSED**.

The Court will permit the following claims to **PROCEED**: (1) the First Amendment retaliation claim related to Mr. Burton's termination from his prison job asserted against

Commissary Officer Leal and Commissary Supervisors Stack and Salerno and Warden Butricks
in their individual capacities and against CEC Director Gaglione, Commissary Manager Rienzi,
Deputy Warden Guadarrama, Commissary Officer Leal and Commissary Supervisors Stack and
Salerno and Warden Butricks in their official capacities to the extent that Mr. Burton seeks
injunctive relief related to his reinstatement to a prison job at 90 cents an hour and back pay at
the same rate of pay; (2) the Eighth Amendment conditions of confinement claim related to Mr.
Burton's exposure to second-hand smoke asserted against Commissary Supervisors Salerno and
Stack, Commissary Manager Renzi, Commissary Officer Leal, Warden Butricks and CEC
Director Gaglione in their individual capacities; and (3) the Fourteenth Amendment equal
protection claim related to his termination from his job in the commissary asserted against
Commissary Supervisor Salerno in her individual capacity.

      **(2)**      **By September 3, 2021**, the Clerk of Court shall prepare a summons form and
send an official capacity service packet to the U.S. Marshals Service. The U.S. Marshals Service
shall serve the summons, a copy of the Complaint, and a copy of this order on CEC Director
James Gaglione, Commissary Manager Lou Rienzi, Commissary Officer Leal, Commissary
Supervisor Stack, Commissary Supervisor Maryann Salerno and Warden Kenneth Butricks in
their official capacities by delivering the necessary documents in person to the Office of the
Attorney General, 165 Capitol Avenue, Hartford, CT 06160.

      **(3)**      The Clerk of Court shall verify the current work addresses of CEC Director James
Gaglione, Commissary Manager Lou Rienzi, Commissary Officer Leal, Commissary Supervisor
Stack, Commissary Supervisor Maryann Salerno, and Warden Kenneth Butricks with the
Department of Correction Legal Affairs Unit. The Clerk of Court shall mail a copy of the
complaint, this order, and a waiver of service of process request packet to each defendant in his

or her individual capacity at his or her confirmed address. On the thirty-fifth (35th) day after mailing, the Clerk shall report to the Court on the status of the requests. If any Defendant fails to return the waiver request, the Clerk of Court shall arrange for in-person service by the U.S. Marshals Service and that Defendant shall be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

**(4)**    Defendants Gaglione, Rienzi, Leal, Stack, Salerno, Butricks, and Guadarrama shall file their response to the Complaint, either an Answer or motion to dismiss, by **November 12, 2021**. If the Defendants choose to file an Answer, they shall admit or deny the allegations and respond to the cognizable claims recited above. They may also include any and all additional defenses permitted by the Federal Rules.

**(5)**    Discovery, under Federal Rules of Civil Procedure 26 through 37, shall be completed by **February 11, 2022**. Discovery requests need not be filed with the Court.

**(6)**    All motions for summary judgment shall be filed by **March 11, 2022**.

**(7)**    If Mr. Burton changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)2 provides that he MUST notify the Court. Failure to do so can result in the dismissal of the case. Mr. Burton should write PLEASE NOTE MY NEW ADDRESS on the notice. Putting a new address on a letter without indicating that it is a new address is insufficient. If Mr. Burton has more than one pending case, he should indicate all case numbers in the notification of change of address. Mr. Burton should also notify the attorney for the defendants of his new address.

**(8)**    Mr. Burton shall utilize the Prisoner Efiling Program when filing documents with the Court.  Mr. Burton is advised that the Program may be used only to file documents with the Court. Local Court Rule 5(f) provides that discovery requests are not to be filed with the Court.

Therefore, discovery requests must be served on defendants' counsel by regular mail.

**(9)** The Clerk of Court shall immediately enter the District of Connecticut Standing Order Re: Initial Discovery Disclosures concerning cases initiated by self-represented inmates and shall send a copy of the Standing Order to the parties.

**(10)** The Clerk of Court shall send a courtesy copy of the complaint, and this order to the Connecticut Attorney General and the Department of Correction Legal Affairs Unit. The Attorney General and the Department of Correction Legal Affairs Unit Shall preserve any video evidence of the incidents referenced in the complaint giving rise to the First, Eighth, and Fourteenth Amendment claims that proceed in this action.

SO ORDERED at Bridgeport, Connecticut this 9th day of August, 2021.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE