## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

TERRANCE BURTON,
    *Plaintiff,*

    v.                      No. 3:20-cv-1926 (VAB)

MARYANN SALERNO, et al.,
    *Defendants.*

## RULING AND ORDER ON MOTION FOR SUMMARY JUDGMENT

Terrance Burton ("Plaintiff") is currently incarcerated at Carl Robinson Correctional

Institution in Enfield, Connecticut. He has filed a civil rights Complaint *pro se* under 42 U.S.C.

§ 1983 against Commissary Supervisor Maryann Salerno ("Supervisor Salerno"), Commissary

Supervisor Stack ("Supervisor Stack"), Commissary Manager Lou Renzi ("Manager Renzi"),

Commissary Officer Leal ("Officer Leal"), Director of Correctional Enterprises of Connecticut

James Gaglione ("CEC Director Gaglione"),[1] Warden Kenneth Butricks, Deputy Warden Jesus

Guadarrama, Correctional Lieutenant Saas, Correctional External Affairs/Intelligence Officer

McMahon ("Officer McMahon"), Correctional Counselor Stacy Martinez, Administrative

Remedies Coordinator ("ARC") Green, ARC Cooper, and Correctional Officer Moranda.

Mr. Burton's allegations arise from his employment as an inmate worker in the

commissary warehouse at Cheshire Correctional Institution ("Cheshire") from December 10,

2018 until May 28, 2020.

---

[1] Correctional Enterprises of Connecticut ("CEC") is a Unit within the Administration Division of the State of Connecticut Department of Correction. *See Correction Enterprises of Connecticut*, Conn. Dept. of Corr., https://portal.ct.gov/DOC/Enterprise/Enterprise (last visited July 27, 2027). It is evident from the description of CEC on the Department of Correction website that Mr. Burton has misspelled CEC Director James Gaglione's last name as Gaylione. *Id.* Accordingly, the Court directs the Clerk to edit the docket to reflect the correct spelling of Defendant Gaglione's last name as Gaglione.

Defendants have filed a motion for summary judgment, arguing that they are entitled to judgment as a matter of law on the grounds that Mr. Burton failed to exhaust his First Amendment and Fourteenth Amendment claims, that Mr. Burton's claims fail on the merits, that the supervisory Defendants were not personally involved in the alleged violations of constitutional rights, that Mr. Burton is not entitled to injunctive relief, and that Defendants are entitled to qualified immunity. Defs.' Mot. for Summ. J., ECF No. 54; Defs.' Mem. of Law in Supp. of Summ. J., ECF No. 54-1 ("Mem").

For the following reasons, Defendants' motion for summary judgment is **GRANTED in part** and **DENIED in part.**

As to Mr. Burton's First Amendment retaliation claim, Defendants' motion is denied as to Supervisor Salerno and Officer Leal and granted as to Supervisor Stack and Warden Butricks. Defendants' motion is also denied as to Mr. Burton's request for permanent injunctive relief in the form of reinstatement to a prison job at the same pay rate.

As to Mr. Burton's Eighth Amendment conditions of confinement claim, Defendants' motion is denied as to Manager Renzi and granted as to Director Gaglione, Warden Butricks, and Deputy Warden Guadarrama.

As to Mr. Burton's Fourteenth Amendment equal protection claim against Supervisor Salerno, Defendants' motion is granted.

Defendants' motion is denied insofar as it asserts that Mr. Burton's claims are barred by non-exhaustion and qualified immunity.

I.      **FACTUAL AND PROCEDURAL BACKGROUND**

      A.  **Factual Background**

On December 10, 2018, while incarcerated at Cheshire, Mr. Burton was hired in the

Commissary Warehouse Program. *See* Pl.'s L.R. 56(a)2 Statement of Facts in Opp'n to Summ. J.

¶ 15, ECF No. 62-2 ("Pl.'s L.R. 56(a)2"). His claims in this case arise out of his employment in

the commissary, from which he was terminated on May 28, 2020. *See id.* ¶ 87.

Mr. Burton states that he was exposed to second-hand smoke while working at the

commissary. Pl.'s Additional Material Facts ¶ 20, ECF No. 62-2 ("Pl's Additional Facts"). He

claims that Supervisor Salerno and other staff members would smoke cigarettes right outside the

warehouse doors, near Mr. Burton's workstation. *Id.* ¶ 20; Burton Aff. ¶¶ 34–35, ECF No. 62-3.

Mr. Burton states that he was unable to avoid the fumes from the smokers because of their

proximity to his workstation. Pl.'s Additional Facts ¶ 20. Occasionally, according to Mr. Burton,

Supervisor Salerno would be smoking only a few feet away from Mr. Burton while he was

working at the head of the line or as a bagger, when he had to retrieve items close to where

Supervisor Salerno was standing next to one of the doors. *Id.*

Defendants claim that commissary staff used a designated smoking area fifty feet away

from Mr. Burton's workstation for cigarette breaks and that the odor of the smoke would only

occasionally filter into the commissary. Defs.' L.R. 56(a)1 Statement ¶¶ 38–39, ECF No. 54-2

("Defs.' L.R. 56(a)1"). Mr. Burton, however, states that there was no designated smoking area

or, that if there was one, Supervisor Salerno did not use it. Pl.'s Additional Facts ¶ 21.

Mr. Burton also states that he has permanent lung damage and that Supervisor Salerno

was aware of his lung condition. *Id.* ¶¶ 2, 14.

Mr. Burton told Manager Renzi that he had a lung issue and was being exposed to second-hand smoke by Supervisor Salerno. Pl.'s L.R. 56(a)2 ¶ 79. Mr. Burton also informed Manager Renzi that Supervisor Salerno had accused him of stealing envelopes. *Id.* ¶ 78. According to Mr. Burton, these accusations were false, and another inmate had misplaced the envelopes. Pl.'s Additional Facts ¶ 24. As a result of these complaints, Manager Renzi arranged for Mr. Burton to be reassigned to the position of verifier/bagger under the direct supervision of Supervisor Stack. *See* Pl.'s L.R. 56(a)2 ¶¶ 80–81, 135. Manager Renzi also spoke to Supervisor Salerno about Mr. Burton's complaints. *Id.* ¶¶ 82–83.

Although the verifier/bagger position at times involved the assistance of other participants, Pl.'s L.R. 56(a)2 ¶ 136, Mr. Burton conducted his job without assistance, Stack Decl. ¶ 19, ECF No. 54-11. Mr. Burton states that he was forced to perform these two jobs—verifier and bagger—by himself for weeks. Pl.'s Additional Facts ¶ 37. He further claims that, if another participant came to help him, Supervisor Salerno or Officer Leal would tell them to work elsewhere. *Id.* ¶¶ 37–38.

Mr. Burton also states that he heard Supervisor Salerno tell other staff members that she wanted him fired on March 19, 2020, March 20, 2020, and May 23, 2020. *Id.* ¶ 41.

On May 27, 2020, the day before Mr. Burton was terminated, he was working in the commissary as a verifier/bagger. *See* Pl.'s L.R. 56(a)2 ¶ 35. At one point during the day, Mr. Burton was on the platform of the commissary loading dock. *See id.* ¶ 34. Defendants state that Mr. Burton was unsupervised and that, as a verifier/bagger, he had no reason to be in this area of the Commissary. Defs.' L.R. 56(a)1 ¶¶ 34–35. Mr. Burton, meanwhile, states that he was neither unsupervised nor out of place because he was accompanied by a corrections officer. *See* Pl.'s L.R. 56(a)2 ¶¶ 34–35; Pl.'s Additional Facts ¶ 42.

4

On May 28, 2020, Mr. Burton was again working as a verifier/bagger when Supervisor Salerno delivered two baskets to Mr. Burton's workstation. Pl.'s L.R. 56(a)2 ¶¶ 36–37. The baskets then fell to the floor; Mr. Burton claims that Supervisor Salerno pushed them off the table and cursed at him, while Supervisor Salerno denies that she caused the baskets to fall. *See id.* ¶¶ 37, 111. After the baskets fell, Mr. Burton sat at his workstation without processing further commissary orders, then stood up and remained standing for a period of time before leaving his workstation and speaking to a staff member. *See id.* ¶¶ 37, 117. Defendants state that Mr. Burton was not working during this period, while Mr. Burton states that he was upset about the incident with Supervisor Salerno and was looking for Supervisor Stack to explain the situation. *See id.* ¶ 37.

Mr. Burton then walked to Manager Renzi's office, where Manager Renzi was meeting with Supervisor Stack. *See id.* ¶¶ 137–38. Defendants state that Mr. Burton did not have permission to leave his workstation, while Mr. Burton states that he instructed to do so by Officer Leal. *See id.* ¶¶ 118, 137. Supervisor Stack then directed Mr. Burton to leave the commissary. *Id.* ¶ 141.

After this incident, Supervisor Salerno decided to terminate Mr. Burton from the commissary program. *See id.* ¶¶ 119–20. She asked Officer Leal to verify what she had observed of Mr. Burton's conduct and instructed him to prepare the paperwork for Mr. Burton's termination. *Id.*

Both before and after his termination, Mr. Burton raised complaints about his treatment in the commissary to the Defendants. He states that he wrote a letter to Director Gaglione on March 15, 2020, although Director Gaglione denies receiving this letter. *See id.* ¶ 57. On May 28, 2020, and June 20, 2020, Mr. Burton also sent letters to Director Gaglione protesting his

termination and asserting other complaints. *See id.* ¶¶ 56, 58. The same day, he sent an inmate request to Warden Butricks regarding his termination. *See id.* ¶ 48. On June 1, 2020, Mr. Burton sent another inmate request regarding his termination from the commissary to Deputy Warden Petterson. *See id.* ¶ 61. Deputy Warden Guadarrama responded to the request a few days later. *See id.* ¶ 62. Director Gaglione, Warden Butricks, and Deputy Warden Guadarrama each investigated Mr. Burton's complaints and concluded that he had not been improperly terminated. *See id.* ¶¶ 49, 59, 62–63.

### B. Procedural History

On December 29, 2020, Mr. Burton filed his Complaint *pro se*, along with a motion for leave to proceed *in forma pauperis* and a motion for a preliminary injunction and a temporary restraining order. *See* Compl., ECF No. 1; Mot. for Leave to Proceed in Forma Pauperis, ECF No. 2; Mot. for Preliminary Injunction and Temporary Restraining Order, ECF No. 4.

On January 12, 2021, the Court granted Mr. Burton leave to proceed *in forma pauperis*. Order. ECF No. 9.

On August 9, 2021, the Court issued an Initial Review Order ("IRO") in which it permitted Mr. Burton to proceed with his First Amendment retaliation claim, his Eighth Amendment conditions of confinement claim, and his Fourteenth Amendment equal protection claim. Initial Review Order and Order Denying Mot. for Preliminary Injunction and Temporary Restraining Order, ECF No. 25 ("IRO"). The Court also denied Mr. Burton's motion for a preliminary injunction but permitted his claim for injunctive relief to proceed as it relates to reinstatement to a prison job. *See id.* at 29–31.

On September 15, 2021, the Court *sua sponte* appointed pro bono counsel for Mr. Burton. Order, ECF No. 31.

On March 25, 2022, Defendants filed their motion for summary judgment. Defs.' Mot. for Summ. J.

On June 15, 2022, Mr. Burton filed an opposition to Defendants' motion. Obj. to Defs.' Mot. for Summ. J., ECF No. 62 ("Opp'n").

Defendants have not filed a reply in support of their motion, and the relevant deadline has passed. *See* D. Conn. L. Civ. R. 7(d). Thus, the motion is fully briefed.

## II.     STANDARD OF REVIEW

A court will grant a motion for summary judgment if the record shows no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient evidence to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48.

"[T]he substantive law will identify which facts are material." *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*; *see Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("[M]ateriality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." (citing *Anderson*, 477 U.S. at 248)).

"The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be

resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the non-moving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (internal quotation marks omitted).

The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* (internal quotation marks omitted). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 (1967); and *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

When deciding a motion for summary judgment, a court may review the entire record, including the pleadings, depositions, answers to interrogatories, admissions, affidavits, and any other evidence on file to determine whether there is any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c); *Pelletier v. Armstrong*, No. 3:99-cv-01559 (HBF), 2007 WL 685181, at *7 (D. Conn. Mar. 2, 2007). In reviewing the record, a court must "construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013). If there is any evidence in the record from which a reasonable factual inference could be drawn in favor of the non-moving party on the issue for which summary judgment is sought, then summary

judgment is improper. *See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

## III.   DISCUSSION

In its Initial Review Order, the Court permitted Mr. Burton to proceed on (1) his First Amendment retaliation claim for damages against Supervisor Salerno, Supervisor Stack, Officer Leal, and Warden Butricks, as well as for injunctive relief against these and other Defendants; (2) his Eighth Amendment second-hand smoke claims for damages against Supervisor Salerno, Supervisor Stack, Manager Renzi, Officer Leal, Warden Butricks, and Director Gaglione; and (3) Mr. Burton's Fourteenth Amendment equal protection claim for damages against Supervisor Salerno. IRO at 37–38.

Defendants have moved for summary judgment on the grounds that (1) Mr. Burton failed to exhaust his administrative remedies with respect to his First and Fourteenth Amendment claims; (2) Mr. Burton's First Amendment retaliation claim fails on the merits; (3) Mr. Burton's Eighth Amendment claim fails on the merits; (4) Defendants Butricks, Gaglione, Guadarrama, and Renzi were not personally involved in the alleged violations of Mr. Burton's constitutional rights; (5) Mr. Burton's Fourteenth Amendment equal protection claim fails on the merits; (6) Mr. Burton is not entitled to injunctive relief on his First Amendment retaliation claim; and (7) Defendants are entitled to qualified immunity.

The Court will address each of these issues in turn.

### A.  Exhaustion

The Prison Litigation Reform Act ("PLRA") requires a prisoner pursuing a federal lawsuit to exhaust available administrative remedies before a court may hear his case. *See* 42 U.S.C. § 1997e(a) (providing in pertinent part that "[n]o action shall be brought with respect to

prison conditions under section 1983 . . . or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted"); *see also Porter v. Nussle*, 534 U.S. 516, 532 (2002) ("[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.").

Prisoners "cannot satisfy the PLRA's exhaustion requirement solely by . . . making informal complaints" to prison officials. *Macias v. Zenk*, 495 F.3d 37, 44 (2d Cir. 2007); *see also Day v. Chaplin*, 354 F. App'x 472, 474 (2d Cir. 2009) (summary order) (affirming grant of summary judgment for failure to exhaust administrative remedies and stating that informal letters sent to prison officials "do not conform to the proper administrative remedy procedures"); *Timmons v. Schriro*, Nos. 14-cv-6606 (RJS), 14-cv-6857 (RJS), 2015 WL 3901637, at *3 (S.D.N.Y. June 23, 2015) ("[T]he law is well-settled that informal means of communicating and pursuing a grievance, even with senior prison officials, are not sufficient under the PLRA.").

The PLRA requires "proper exhaustion." This means that the inmate must use all steps required by the administrative review process applicable to the institution in which he is confined and do so properly. *Jones v. Bock*, 549 U.S. 199, 218 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)); *see also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion requires "using all steps that the agency holds out, and doing so properly"). "Exhaustion is mandatory— unexhausted claims may not be pursued in federal court." *Amador*, 655 F.3d at 96. The Supreme Court has held that a claim is properly exhausted only when a grievance is filed in accordance with the deadlines established by the administrative remedy policy. *Jones*, 549 U.S. at 217–18 (citing *Woodford*, 548 U.S. at 93–95).

The general inmate grievance procedure applicable to Mr. Burton's claims is set forth in Administrative Directive 9.6. *See* Ex. 1 to Cooper Decl., at 6–19, ECF No. 54-4 ("A.D. 9.6").

A Level 1 grievance must be filed within thirty calendar days from the date of the occurrence or discovery of the cause of the grievance and should include a copy of the response to the written request to resolve the matter informally or explain why the response is not attached. *Id.* The Unit Administrator shall respond in writing to a Level 1 grievance within thirty business days of his or her receipt of the grievance. A.D. 9.6(6)(I). The Unit Administrator may extend the response time by up to fifteen business days upon notice to the inmate on the prescribed form. A.D. 9.6(6)(J).

The inmate may appeal the disposition of a Level 1 grievance by the Unit Administrator, or the Unit Administrator's failure to dispose of the grievance in a timely manner, to Level 2. A.D. 9.6(6)(G), (I) & (K). A Level 2 appeal of a disposition of a Level 1 grievance must be filed within five calendar days from the inmate's receipt of the decision on the Level 1 grievance. A.D. 9.6(6)(K). An appeal of a Unit Administrator's failure to dispose of a Level 1 grievance in a timely manner must be filed within sixty-five days from the date the Level 1 grievance was filed by the inmate. A.D. 9.6(6)(M).

Level 3 appeals are restricted to challenges to department policy, the integrity of the grievance procedure, or Level 2 appeals to which there has been an untimely response by the District Administrator. A.D. 9.6(6)(L).

Exhaustion of administrative remedies is an affirmative defense. Thus, the defendants bear the burden of proof. *See Jones*, 549 U.S. at 216. If the defendants establish that administrative remedies were not exhausted before the inmate commenced the action, the plaintiff must establish that administrative remedy procedures were not available to him or

present evidence showing that he did exhaust his administrative remedies. *See Smith v. Kelly*, 985 F. Supp. 2d 275, 284 (N.D.N.Y. 2013) ("[O]nce a defendant has adduced reliable evidence that administrative remedies were available to the plaintiff and that the plaintiff nevertheless failed to exhaust those administrative remedies, the plaintiff must then 'counter' the defendant's assertion by showing exhaustion [or] unavailability.").

Defendants concede that Mr. Burton exhausted his administrative remedies with respect to his Eighth Amendment claims regarding exposure to second-hand smoke. Mem. at 25. They argue, however, that none of his grievances specifically allege that he was terminated from his job in retaliation for his complaints. *Id.* Defendants also contend that Mr. Burton failed to exhaust his administrative remedies with respect to his Fourteenth Amendment equal protection claim. *Id.*

Mr. Burton disputes Defendants' characterization of his grievances. He argues that his grievances specifically state that he was subject to retaliation, which resulted in his removal from the commissary program. Opp'n at 27. He also contends that his grievances sufficiently alleged that his constitutional rights had been violated as a result of Salerno's discriminatory treatment. *Id.* at 27–28. Thus, Mr. Burton argues, he has exhausted his Eighth Amendment and Fourteenth Amendment claims. *See id.*

The Court agrees.

While a plaintiff "need not specifically articulate his claims in his grievances in the exact manner as his claim in federal court," the grievance must "provide notice to the defendants about the factual basis of his claim." *Otero v. Purdy*, No. 3:19-cv-01688 (VLB), 2021 WL 4263363, at *7 (D. Conn. Sept. 20, 2021) (citing *Espinal v. Goord*, 558 F.3d 119, 127–28 (2d Cir. 2009)).

Even if Mr. Burton's grievances did not specifically allege that he was fired in retaliation for his protected speech, his grievances provided Defendants with sufficient notice about the factual basis for his claims. In a grievance dated June 13, 2020—after Mr. Burton had been removed from the commissary program—he stated that Supervisor Salerno "targeted me" and "used her power to retaliate against me." Ex. 2 to Cooper Decl. at 60, ECF No. 54-4. Mr. Burton further alleges that he "was targeted for retaliation by Salerno and others" after he sought informal resolution for his dispute with Supervisor Salerno. *Id.* These statements were sufficient to make Defendants aware that Mr. Burton believed he had been removed from the commissary program in retaliation for his prior complaints against Supervisor Salerno. Mr. Burton was not required, as Defendants contend, to "specifically state his termination was because of [Supervisor Salerno's] retaliatory conduct." Mem. at 25.

Mr. Burton properly appealed this grievance to Level 2, sufficiently exhausting his administrative remedies under A.D. 9.6. *See* Ex. 2 to Cooper Decl. at 115.

Accordingly, Defendants' motion for summary judgment on the basis of failure to exhaust administrative remedies will be denied.[2]

### B.  The First Amendment Retaliation Claim

To prevail on a retaliation claim, Mr. Burton must present evidence establishing three elements: (1) he engaged in protected speech or conduct, (2) Defendants took adverse action against him, and (3) a causal connection between the protected speech and the adverse action. *Burns v. Martuscello*, 890 F.3d 77, 84 (2d Cir. 2018). The adverse action must be sufficiently

---

[2] Although the Court will grant Defendants' motion for summary judgment with respect to Mr. Burton's Fourteenth Amendment claims, *see infra* Part III.D, the Court disagrees with Defendants that the Fourteenth Amendment claim was not properly exhausted. In the Inmate Request Form attached to a grievance filed on June 4, 2020, Mr. Burton stated that Supervisor Salerno had been "targeting me for months now" and telling Officer Leal "she want[ed] to fire me." Ex. 2 to Cooper Decl., at 49. As with the First Amendment retaliation claim, these statements were sufficient to alert Defendants to the basis for Mr. Burton's equal protection claim.

serious that it would deter a similarly situated person of ordinary firmness from exercising his right to speech. *See id.* at 93–94.

An inmate's written complaint, grievance, or request constitutes "a protected activity" under the first element of the retaliation analysis. *Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019) (citation omitted). The Second Circuit, however, "has yet to articulate a bright line rule regarding constitutionally protected oral speech by an inmate." *Booker v. Griffin*, No. 16-cv-00072 (NSR), 2018 WL 1614346, at *17 (S.D.N.Y. Mar. 31, 2018) (citations omitted).

District courts within this Circuit have concluded in some circumstances that the scope of protected activity extends "beyond the filing of formal grievances to oral complaints made to corrections officers." *Tirado v. Shutt*, No. 13-cv-2848 (LTS) (AJP), 2015 WL 4476027, at *4 (S.D.N.Y. July 22, 2015); *see also Gómez v. Dep't of Corr.*, No. 3:20-cv-00958 (JAM), 2020 WL 6526108, at *3 (D. Conn. Nov. 4, 2020) ("A prisoner has a right under the First Amendment to complain about prison conditions, especially conditions that the prisoner believes endanger his health and safety."); *McMillian v. County of Onondaga*, No. 9:13-cv-1124 (TJM/ATB), 2015 WL 1403459, at *10–11 (N.D.N.Y. Mar. 26, 2015) ("There is support for the proposition that an inmate's verbal complaints might serve as the basis for a section 1983 retaliation claim."), *report and recommendation adopted*, 2016 WL 9781807 (N.D.N.Y. Mar. 29, 2016), *aff'd*, 710 F. App'x 458 (2d Cir. 2017).

In evaluating the second element, "only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." *Wrobel v. County of Erie*, 692 F.3d 22, 31 (2d Cir. 2012) (internal quotation marks omitted). "Prisoners may be required to tolerate more than public employees . . . before a retaliatory action taken against them is considered adverse." *Dawes v. Walker*, 239 F.3d

489, 493 (2d Cir. 2001) (alteration and internal quotation marks omitted), *overruled on other grounds by Swierkiewicz v. Sorema N. A.*, 534 U.S. 506 (2002); *see also Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (noting that courts review prisoners' retaliation claims "with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act").

To establish a causal connection under the third element, a plaintiff must present more than conclusory allegations. He may, however, rely on circumstantial evidence, such as "(1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his motivation." *Merriweather v. O'Meara,* No. 9:17-cv-1129 (LEK/TWD), 2018 WL 10038783, at *5 (N.D.N.Y. Feb. 16, 2018) (internal quotation marks omitted). Even if a plaintiff establishes such a causal connection, a defendant "may nonetheless avoid liability by showing that he or she would have taken the adverse action even in the absence of the protected conduct." *Brandon*, 938 F.3d at 40 (internal quotation marks omitted).

In its Initial Review Order, the Court permitted Mr. Burton's First Amendment claim to proceed against Officer Leal, Supervisors Stack and Salerno, and Warden Butricks based on Mr. Burton's allegation that he was removed from the commissary program in retaliation for his complaints about conditions in the warehouse and the conduct of Officer Leal and Supervisors Salerno and Stack. IRO at 12–13.

The Court will address Mr. Burton's allegations against each of these Defendants in turn.

### 1. Supervisor Salerno

Defendants argue that Mr. Burton cannot establish the elements of a retaliation claim against Supervisor Salerno. Mem. at 12. They further contend that Supervisor Salerno removed Mr. Burton from the commissary program solely because he violated program rules. *Id.*

Mr. Burton argues that he satisfies the first element of a retaliation claim because he raised complaints about Supervisor Salerno's conduct several times to various correctional officials. *See* Opp'n at 14. As to the second element, Mr. Burton contends that Supervisor Salerno terminated him from the commissary program and forced him to perform two jobs at once. *Id.* Finally, Mr. Burton argues that there is evidence of the third element, a causal connection, because Officer Leal told Mr. Burton that Supervisor Salerno had been targeting Mr. Burton and because Supervisor Salerno repeatedly cursed at Mr. Burton and knocked a basket off of his workstation before he was terminated. *Id.* at 15.

The Court agrees.

First, Mr. Burton's complaints about Defendants' conduct and conditions in the commissary qualified as protected First Amendment activity. Mr. Burton states that he raised these complaints in a March 15, 2020 letter to CEC Director Gaglione, in a March 2020 conversation with Warden Butricks, and at a March 11, 2020 commissary meeting.[3] Opp'n at 14–15; *see also* Pl.'s Additional Facts ¶¶ 26, 29, 31.The written complaint to Director Gaglione qualifies as protected conduct because such complaints, like formal administrative grievances, fall within "the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments." *Graham*, 89 F.3d at 80.

---

[3] Manager Renzi confirms that Mr. Burton spoke to him at some point about Supervisor Salerno's smoking and her accusation that Mr. Burton was stealing envelopes. Renzi Decl. ¶ 17, ECF No. 54-9. Because Manager Renzi does not recall the specific date, it is unclear whether this conversation was separate from the meeting on March 11, 2022. *See id.*

Although the Second Circuit has not clearly defined whether oral complaints qualify as protected activity, Mr. Burton's oral complaints are more similar to petitions for redress of grievances than to verbal confrontations with corrections officers, which courts have concluded are not constitutionally protected conduct, *see Ford v. Martuscello*, No. 9:14-cv-01566 (DNH) (DEP), 2016 WL 5322166, at *4 (N.D.N.Y. June 23, 2016) (collecting cases), *report and recommendation adopted*, 2016 WL 5256901 (N.D.N.Y. Sept. 22, 2016). Mr. Burton states that he made an oral complaint to Warden Butricks when Warden Butricks visited Mr. Burton's cell block after holding a meeting at the warehouse to discuss the inmates' concerns. Pl.'s Additional Facts ¶ 29. Similarly, Mr. Burton complained about Defendants' conduct at a March 11, 2020 meeting that was held because the inmates were concerned about mistreatment by the commissary staff. *Id.* Thus, both Mr. Burton's written and oral complaints qualify as protected activity under the first element of the retaliation analysis.

Second, Mr. Burton's removal from the commissary program, and his accompanying loss of income, qualifies as an adverse action under the second element of the retaliation analysis. Even under the elevated standard that applies to prisoners, termination from a paid position would "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Brandon*, 938 F.3d at 40 (internal quotation marks omitted).[4] Defendant Salerno was directly involved in the decision to terminate Mr. Burton. *See* Pl.'s L.R. 56(a)2 ¶ 120. Thus, the second element of the retaliation analysis is satisfied with respect to Supervisor Salerno.

---

[4] Mr. Burton also contends that forcing him to work two jobs at once qualified as an adverse action. Opp'n at 14. Although Defendants do not specifically challenge Mr. Burton's contention, this may be the type of treatment that a prisoner has to endure even though a public employee does not. *See Dawes*, 239 F.3d at 493 ("Prisoners may be required to tolerate more than public employees . . . before a retaliatory action taken against them is considered adverse." (alteration and internal quotation marks omitted)). At this point, Mr. Burton does not describe in detail the burden that this treatment imposed. Nonetheless, the Court concludes that there is at least a genuine dispute of material fact as to whether forcing Mr. Burton to work two jobs at once qualified as an adverse action.

Third, there is a genuine dispute of material fact as to whether there is a causal connection between Mr. Burton's protected conduct and the adverse actions taken by Supervisor Salerno. As the Court noted in its Initial Review Order, a relatively short time period of two-and-a-half months elapsed between the meeting at which Mr. Burton asserted his complaints and the decision to remove him from the commissary program. IRO at 12. Furthermore, Mr. Burton states that he heard Supervisor Salerno say that she wanted him fired and that Officer Leal told Mr. Burton that Supervisor Salerno had been targeting Mr. Burton for months. Pl.'s Additional Facts ¶¶ 41, 49. Mr. Burton's evidence, construed in the light most favorable to him, also suggests that he was an effective employee who had received raises and promotions. *See id.* ¶¶ 4, 15. This circumstantial evidence is sufficient to raise a triable issue of fact as to whether Supervisor Salerno's actions were taken in retaliation for Mr. Burton's complaints. *See Merriweather*, 2018 WL 10038783, at *5 (noting that temporal proximity, a defendant's own statements about her motivations, and a plaintiff's good disciplinary history can establish a causal connection for purposes of a retaliation claim).

Finally, there is a genuine dispute of material fact as to whether Supervisor Salerno would have removed Mr. Burton from the commissary program even if he had not engaged in the protected activity. Defendants claim that Supervisor Salerno terminated Mr. Burton solely because he broke program rules, which provide that behaviors such as being "out of place" will result in immediate removal. Mem. at 12; Pl.'s L.R. 56(a)2 ¶ 21. They also point out that Supervisor Salerno had terminated other commissary program participants for a variety of reasons, including violation of program rules. *See* Mem. at 17–18; Pl.'s L.R. 56(a)2 ¶ 98. These facts, however, do not establish that all participants who violate program rules are terminated. As Mr. Burton points out, even though the program rules state that being out of place will result in

immediate removal, Supervisor Salerno did not terminate Mr. Burton until the following day, after the separate incident in which the baskets fell to the ground. *See* Opp'n at 15. Thus, Defendants have not conclusively established that Mr. Burton necessarily would have been removed from the program for the conduct that purportedly violated program rules.

Accordingly, the Court will deny Defendants' motion for summary judgment with respect to Mr. Burton's First Amendment retaliation claim against Supervisor Salerno.

### 2. Officer Leal

Defendants also argue that Mr. Burton cannot establish the elements of a retaliation claim against Officer Leal. They contend that Officer Leal did not deliberately ignore Supervisor Salerno's potential retaliation and had no retaliatory motive himself. *See* Mem. at 11–12. According to Defendants, Officer Leal also did not take an adverse action against Mr. Burton because he merely concurred with Supervisor Salerno's decision that Mr. Burton should be terminated for violating program rules. *See id.*

Mr. Burton argues that Officer Leal participated in Supervisor Salerno's retaliation on several occasions. *See* Opp'n at 16–17. Thus, he contends, there is a triable issue of fact as to whether Officer Leal retaliated against Mr. Burton for his complaints about conditions in the commissary. *See id.*

The Court agrees.

Although it is a close question, there is a genuine dispute of material fact as to whether Mr. Burton can establish a retaliation claim against Officer Leal. Mr. Burton has presented sufficient evidence suggesting that Officer Leal personally participated in Mr. Burton's termination from the commissary program. Defendants concede that Officer Leal was not merely following orders, but instead exercised his own judgment when he "concurred with Salerno's

decision that Plaintiff should be terminated." Mem. at 12. Mr. Burton also states that Officer Leal followed Supervisor Salerno's orders to punish Mr. Burton—on one occasion by directing another participant to work elsewhere and forcing Mr. Burton to perform two jobs on his own, Burton Aff. ¶ 73, and on another occasion by removing Mr. Burton from the commissary work schedule, *id.* ¶ 61.

But compared to Supervisor Salerno, there is less evidence of a causal connection with respect to Officer Leal. Mr. Burton's complaints were directed primarily at Supervisor Salerno, and Mr. Burton has not put forward similar evidence showing that Officer Leal harbored animosity towards Mr. Burton. In fact, Mr. Burton states that Officer Leal disclosed to him that Supervisor Salerno had been targeting Mr. Burton. Opp'n at 17. This disclosure suggests that Officer Leal may not have shared Supervisor Salerno's purported retaliatory motive. Furthermore, Defendants contend that Officer Leal believed that the issues between Mr. Burton and Supervisor Salerno had been resolved by Mr. Burton's reassignment to a verifier/bagger position under the authority of Supervisor Stack. *See id*; Pl.'s L.R. 56(a)2 ¶ 135.

Nonetheless, Officer Leal's implementation of orders from Supervisor Salerno that targeted Mr. Burton—along with Officer Leal's ratification of Supervisor Salerno's decision to terminate Mr. Burton—raises a triable issue of fact as to whether there was a causal connection between Mr. Burton's complaints and Officer Leal's purported adverse actions.

Accordingly, the Court will deny Defendants' motion for summary judgment with respect to Mr. Burton's retaliation claim against Officer Leal.

### 3. Supervisor Stack

Defendants argue that Supervisor Stack is entitled to summary judgment on the retaliation claim because he was not involved in the decision to terminate Mr. Burton and

therefore did not take an adverse action against him. Mem. at 12–13. Defendants also argue that Mr. Burton cannot satisfy the first or third elements of his claim because there were no disputes between Mr. Burton and Supervisor Stack that could have led Supervisor Stack to retaliate against Mr. Burton. *See id.*

Mr. Burton argues that Supervisor Stack was aware of Supervisor Salerno's animosity towards Mr. Burton and nonetheless failed to act. *See* Opp'n at 17. Mr. Burton appears to suggest that this failure is sufficient to sustain a retaliation claim.

The Court disagrees.

The Second Circuit has made clear that a plaintiff must prove that each Government-official defendant, "through the official's own individual actions," has violated the Constitution. *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Thus, Mr. Burton must establish that Supervisor Stack's own conduct amounts to an adverse action. Mr. Burton does not suggest that Supervisor Stack was personally involved in the decision to remove Mr. Burton from the program. He also has not identified any authority suggesting that Supervisor Stack's purported failure to intervene in Supervisor Salerno's conduct, without more, constitutes an adverse action. As a result, Mr. Burton has not raised a genuine dispute of material fact as to whether Supervisor Stack took an adverse action against him.

Accordingly, the Court will grant Defendants' motion for summary judgment with respect to Mr. Burton's retaliation claim against Supervisor Stack.

### 4.  Warden Butricks

Defendants argue that Mr. Burton cannot establish a retaliation claim against Warden

Butricks because Warden Butricks was neither involved in nor even aware of Mr. Burton's

termination. *See* Mem. at 11.

Mr. Burton, meanwhile, argues that Warden Butricks had previously promised to

"remove the staff member from the program" if a staff member was causing problems for Mr.

Burton. Opp'n at 14. Thus, Mr. Burton contends, there is a triable issue of fact as to Warden

Butricks's actions in relation to Mr. Burton's termination. *See id.*

The Court disagrees.

Mr. Burton has not put forward any evidence suggesting that Warden Butricks was,

through his own actions, responsible for Mr. Burton's termination or any other adverse action.

And even assuming that Warden Butricks had promised to remove a staff member with whom

Mr. Burton had a conflict[5] and that the failure to do so qualified as an adverse action, Mr. Burton

has not put forward any evidence suggesting that this failure was causally connected to any of

Mr. Burton's protected conduct.

Accordingly, the Court will grant Defendants' motion for summary judgment with

respect to Mr. Burton's retaliation claim against Warden Butricks.

### C.  The Eighth Amendment Claim

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments," U.S.

Const. amend. VIII, which includes punishments that "involve the unnecessary and wanton

---

[5] Although Mr. Burton states in his opposition that Warden Butricks promised to remove the staff member causing
problems for Mr. Burton, this appears to be a misinterpretation of Mr. Burton's affidavit. In that affidavit, Mr.
Burton states that Warden Butricks told him, "if there is a problem with what is going on in the commissary then
they could see him and he will remove them from the program." Burton Aff. ¶ 52. Warden Butricks went on to say
that "if [Mr. Burton] [does] not put up with these issues then [he] will have to leave the program and . . . will not be
able to get another job." *Id.* ¶ 53. Thus, Mr. Burton's affidavit appears to indicate that Warden Butricks promised to
remove the participant, rather than the staff member, if there continued to be problems in the commissary.

infliction of pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). Although the Constitution does not require "comfortable" prison conditions, the Eighth Amendment requires that prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832–33 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)).

To prove a claim for deliberate indifference to health or safety due to unconstitutional conditions of confinement, an inmate must satisfy both an objective and a subjective element. To meet the objective element, the inmate must establish that he was incarcerated under a condition or a combination of conditions that resulted in a "sufficiently serious" deprivation of a life necessity or a "human need[]" or posed "a substantial risk of serious harm" to his health or safety. *Id.* at 834; *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

To meet the subjective element, an inmate must establish that the defendants possessed culpable intent; that is, the officials knew that he or she faced a "substantial risk" to his or her health or safety and "disregard[ed] that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. Thus, proof of "mere negligence" is insufficient. *Id.* at 835.

In it is Initial Review Order, the Court permitted Mr. Burton's Eighth Amendment second-hand smoke claim to proceed against Supervisor Salerno, Supervisor Stack, Officer Leal, Manager Renzi, Warden Butricks, and Director Gaglione. IRO at 24. Mr. Burton has alleged that he has a lung condition and that he was exposed to second-hand smoke by Supervisor Salerno and other DOC employees who stood outside the commissary warehouse and blew cigarette smoke into the warehouse. IRO at 23.

### 1. The Merits

Defendants concede that exposure to second-hand smoke may support an Eighth Amendment claim. Mem. at 14. They contend, however, that there is no evidence that Mr. Burton suffered from a lung issue that was exacerbated by cigarette smoke. *Id.* at 15. They also argue that there is no evidence commissary staff blew smoke into the building or that Mr. Burton inhaled smoke from Supervisor Salerno's cigarettes. *Id.*

Mr. Burton argues that he has put forward sufficient evidence to survive summary judgment. *See* Opp'n at 20–21. He points to medical records showing that he is undergoing treatment at UConn Health for a lung condition. *See, e.g.*, Ex. A to Burton Aff. at 18, ECF No. 62-3. Mr. Burton also argues that his statements and other evidence are sufficient to create a genuine issue of material fact as to whether Supervisor Salerno smoked right outside the commissary door within a few feet of him. *See* Opp'n at 20.

The Court agrees.

The Supreme Court has held that an inmate plaintiff may have a cognizable Eighth Amendment claim if prison officials exposed him to levels of second-hand smoke "that pose an unreasonable risk of serious damage to his future health." *Helling v. McKinney*, 509 U.S. 25, 35 (1993). Here, Mr. Burton has raised a triable issue of fact as to whether the levels of second-hand smoke he experienced in the commissary warehouse posed such a risk. Although Mr. Burton's medical records do not reveal how much harm he would suffer from exposure to second-hand smoke, one pulmonary specialist reported that Mr. Burton has a "particular reaction to inhaled smoke" and advised that Mr. Burton should avoid settings where he will be exposed to smoke. Ex. A to Burton Aff. at 35.

There is a genuine question of fact as to the distance between Mr. Burton and Supervisor Salerno and the other smokers. Defendants contend that the commissary staff used a designated smoking area that was about fifty feet away from Mr. Burton's workstation. Mem. at 15. Mr. Burton, however, states that Supervisor Salerno and others would smoke right outside the warehouse doors, only a few feet from his workstation. Pl.'s Additional Facts ¶ 20. According to Mr. Burton, if there was a designated smoking area, Supervisor Salerno did not use it. *Id.* ¶ 21. Mr. Burton's statements are supported to some extent by Manager Renzi, who states that Supervisor Salerno agreed to move farther away from the building so there would be no chance of smoke entering the building when she opened the door to return to the commissary. Renzi Decl. ¶ 20. Although Supervisor Salerno also reported to Manager Renzi that she takes cigarette breaks in the designated smoking area, a jury may reasonably infer that Manager Renzi would not have asked Supervisor Salerno to smoke farther away from the building if she was already fifty feet away from Mr. Burton. Thus, Mr. Burton has raised a triable issue of fact as to the objective prong of the Eighth Amendment analysis.

Mr. Burton has also established a genuine issue of material fact as to the subjective prong. Mr. Burton states that he told Supervisor Salerno about his lung condition in January or February 2019, soon after she began working in the commissary. Pl.'s Additional Facts ¶¶ 12–13. Manager Renzi also acknowledges that he was aware of Mr. Burton's lung condition. Renzi Decl. ¶ 17. Thus, Mr. Burton has presented sufficient evidence that Defendants were aware of a substantial risk to his health and safety.

Accordingly, the Court will deny Defendants' motion for summary judgment as to Mr. Burton's Eighth Amendment claim in its entirety.

### 2.   The Supervisory Defendants

The Second Circuit has held that there is "no special rule for supervisory liability" in the context of § 1983 claims. *Tangreti*, 983 F.3d at 618. Instead, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* at 616 (quoting *Iqbal*, 556 U.S. at 676).

Here, Defendants argue that Warden Butricks, Deputy Warden Guadarrama, Director Gaglione, and Manager Renzi are entitled to summary judgment because they were not personally involved in any alleged constitutional violations. *See* Mem. at 26. More specifically, Defendants contend that Warden Butricks, Deputy Warden Guadarrama, and Director Gaglione were not personally aware that Mr. Burton was exposed to second-hand smoke even after asking staff to stop smoking because he had lung issues. *See id.*

Mr. Burton contends that Warden Butricks, Deputy Warden Guadarrama, Director Gaglione, and Manager Renzi were personally aware of his exposure to second-hand smoke because he informed them of the problem. *See* Opp'n at 28–29. He also argues that these Defendants had the authority to address the problem. *See id.*

The Court agrees, in part.

Defendants do not dispute that Manager Renzi was aware of Mr. Burton's lung issues. *See* Defs.' L.R. 56(a)2 ¶ 79. They emphasize, however, that Manager Renzi responded to Mr. Burton's complaints and asked Supervisor Salerno to smoke farther away from the building. *See id.* ¶ 83. After this point, Defendants' assert, Manager Renzi received no further complaints from Mr. Burton. *See id.* ¶ 84.

Nonetheless, a jury may reasonably infer that Manager Renzi, in his position supervising the Cheshire Commissary, would have been aware if Supervisor Salerno and other commissary

staff disregarded his instructions and continued to smoke immediately outside the warehouse doors rather than in the designated smoking area. Thus, there is a triable issue of fact as to whether Manager Renzi knowingly disregarded a serious risk to Mr. Burton's health.

Mr. Burton has not, however, put forth sufficient evidence for his claims against Warden Butricks, Deputy Warden Guadarrama, and Director Gaglione. Mr. Burton states in his affidavit that he either wrote letters or had conversations with each of these Defendants about his problems in the commissary. *See* Burton Aff. ¶¶ 52–56, 89–90. Most of these communications, however, took place after Mr. Burton was terminated from the commissary program and so cannot form the basis for a claim of deliberate indifference. *See* Pl.'s L.R. 56(a)2 ¶¶ 48, 56, 61.

Moreover, Mr. Burton mentions the second-hand smoke issue only in the context of his March 15, 2020 letter to Director Gaglione.[6] *See* Pl.'s Additional Facts ¶ 31. And even this letter appears to have been written before Manager Renzi spoke to Supervisor Salerno about smoking farther away from the warehouse doors. Mr. Burton filed a grievance about the smoking issue after he wrote his letter to Director Gaglione, and he was notified that commissary staff had been addressed in response to his complaint *See* Ex. 2 to Cooper Decl. at 55, ECF No. 54-4. Thus, Mr. Burton has not created a genuine issue of material fact that Warden Butricks, Deputy Warden Guadarrama, and Director Gaglione disregarded the risk to his health from second-hand smoke.

Accordingly, the Court will grant Defendants' motion for summary judgment with respect to Mr. Burton's Eighth Amendment claims against Warden Butricks, Deputy Warden Guadarrama, and Director Gaglione, but will deny the motion with respect to Mr. Burton's Eighth Amendment claim against Manager Renzi.

---

[6] Director Gaglione denies that he received this letter from Mr. Burton. *See* Defs.' L.R. 56(a)1 ¶ 57. For the purposes of this analysis, the Court will assume that Mr. Burton did in fact send a letter on March 15, 2020.

### D.  The Fourteenth Amendment Equal Protection Claim

The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. It does not mandate identical treatment for each individual or group of individuals. Instead, it requires that similarly situated persons be treated the same. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439–40 (1985).

To prevail on an equal protection claim, a plaintiff must prove that: (1) he was treated differently from similarly situated individuals and (2) that the difference in or discriminatory treatment was based on "impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000) (quoting *LeClair v. Saunders*, 627 F.2d 606, 609–10 (2d Cir. 1980)).

Because Mr. Burton does not argue that the defendants treated him differently or discriminated against him because of his membership in a protected class or based on some suspect classification, he must pursue his equal protection claim under a "class of one" theory. *See* IRO at 20.

To state a valid class-of-one claim, a plaintiff must establish that he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). In the Second Circuit, a class-of-one plaintiff must "show an extremely high degree of similarity between themselves and the persons to whom they compare themselves." *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006).

In its Initial Review Order, the Court permitted Mr. Burton's class-of-one claim to proceed on a limited basis for further development of the record. IRO at 21. The Court "liberally construe[d] the allegations to state a claim that Supervisor Salerno treated him differently than other similarly situated inmates who were employed in the commissary warehouse and that her decision to terminate him from his job was arbitrary." *Id.*

Defendants' evidence establishes that Supervisor Salerno's decision to terminate was not wholly arbitrary. The evidence shows that Mr. Burton was on the commissary loading dock on May 27, 2020. Pl.'s L.R. 56(a)2 ¶ 34; Leal Decl. ¶ 27, ECF No. 54-8. Although Mr. Burton denies Defendants' assertion that he was unsupervised, he offers no reason why he, as a verifier/bagger, would have been authorized to be on the loading dock in the first place. Pl.'s L.R. 56(a)2 ¶¶ 34–35. The commissary program rules forbid a participant from being "out of place" and state that this behavior will result in immediate removal. *Id.* ¶ 21. Thus, because the undisputed evidence shows that Mr. Burton's termination was consistent with the program rules, the Court cannot conclude that it was arbitrary.[7]

Accordingly, the Court will grant Defendants' motion for summary judgment with respect to Mr. Burton's Fourteenth Amendment equal protection claim against Supervisor Salerno.

### E.  Qualified Immunity

With respect to Mr. Burton's First Amendment claim, Defendants concede that it is clearly established that adverse action in retaliation for protected speech violates the First Amendment. *See* Mem. at 31. Nonetheless, they argue that they are entitled to qualified

---

[7] Although Mr. Burton's termination was consistent with program rules, the undisputed evidence does not show that Mr. Burton would have necessarily been terminated for being out of place regardless of any retaliatory motive held by Supervisor Salerno. *See supra* Part III.B.1.

immunity because Mr. Burton was terminated due to violations of program rules, not because of protected speech or conduct. *Id.* Thus, Defendants contend, no reasonable officer would understand that termination for violation of program rules would violate Mr. Burton's First Amendment rights. *Id.*

This line of reasoning merely reiterates Defendants' argument that Mr. Burton was terminated solely because he violated program rules and not because of any retaliatory motive. As the Court discussed above, there is a genuine dispute of material fact as to whether Supervisor Salerno would have terminated Mr. Burton regardless of any retaliatory motive. *See supra* Part III.B.I.

As to Mr. Burton's Eighth Amendment claim, Defendants argue that no reasonable officer would understand that smoking in a designated area approximately fifty feet away from Mr. Burton's workstation violated his right to be free from dangerous exposure to second-hand smoke. Mem. at 31–32. Once again, Defendants merely restate their argument that Mr. Burton cannot prevail on the merits of his claim. As the Court also discussed above, there is a triable question of fact as to whether Mr. Burton was exposed to second-hand smoke by Supervisor Salerno and others who allegedly smoked right outside the warehouse doors. *See supra* Part III.C.1.

Accordingly, Defendants' motion for summary judgment on the basis of qualified immunity will be denied.

### F.  Injunctive Relief

In its Initial Review Order, the Court permitted Mr. Burton's claim for injunctive relief in the form of reinstatement to a job at the same pay rate to proceed against Supervisor Salerno, Supervisor Stack, Officer Leal, Warden Butricks, Director Gaglione, Manager Renzi, and

Deputy Warden Guadarrama in their official capacities. IRO at 31. The Court dismissed all other requests for injunctive relief and denied Mr. Burton's motion for a preliminary injunction. *See* IRO at 29–31.

In their motion for summary judgment, Defendants argue that Mr. Burton has not met the high bar required for a "mandatory preliminary injunction" because he has not established a clear or substantial likelihood of success on the merits. Mem. at 20. Because the Court denied Mr. Burton's motion for a preliminary injunction, there is no pending request for interim injunctive relief. Mr. Burton may be entitled to a permanent injunction requiring reinstatement only if he prevails on the merits of his claims at trial. Thus, Defendants' motion for summary judgment on Mr. Burton's claim for injunctive relief is inappropriate at this stage.

Accordingly, Defendants' motion for summary judgment on Mr. Burton's claim for injunctive relief will be denied.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED in part** and **DENIED in part.**

As to Mr. Burton's First Amendment retaliation claim, Defendants' motion is denied as to Supervisor Salerno and Officer Leal and granted as to Supervisor Stack and Warden Butricks. Defendants' motion is also denied as to Mr. Burton's request for permanent injunctive relief in the form of reinstatement to a prison job at the same pay rate.

As to Mr. Burton's Eighth Amendment conditions of confinement claim, Defendants' motion is denied as to Manager Renzi and granted as to Director Gaglione, Warden Butricks, and Deputy Warden Guadarrama.

As to Mr. Burton's Fourteenth Amendment equal protection claim against Supervisor Salerno, Defendants' motion is granted.

Defendants' motion is denied insofar as it asserts that Mr. Burton's claims are barred by non-exhaustion and qualified immunity.

**SO ORDERED** at Bridgeport, Connecticut, this 13th day of January, 2022.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE